## SEARCY v. NOVO.

No. 5879.

Court of Appeal of Louisiana.
Second Circuit.

March 8, 1939.

Rehearing Denied March 31, 1939.

Writ of Certiorari and Review Denied
May 1, 1939.

Lee J. Novo, of Alexandria, for appellant.

S. R. Holstein, of Winnsboro, and T. H. McGregor, of Alexandria, for appellee.

### TALIAFERRO, Judge.

This suit is a sequence to a settlement between plaintiff and defendant, his attorney, of the amount of the judgment rendered in plaintiff's favor in his suit against the Interurban Transportation Company, Incorporated, et al., reported in the 189 La. 183, 179 So. 75. Defendant represented plaintiff, with the assistance of other counsel, throughout the controversy culminating in the referred to decision. The other counsel entered the case after the suit had been filed and served. The suit was lost in the lower court, was appealed to this court and here lost. See 171 So. 468, and 179 So. 93. The Supreme Court granted a writ of review on plaintiff's application and finally gave him judgment on both phases of his demand against the Interurban Transportation Company, Inc., only. When this judgment became final, this defendant issued its check in favor of plaintiff, the defendant herein, and his associate counsel, T. H. McGregor and S. R. Holstein, for $3941.39 to discharge the judgment. Its counsel in Shreveport, Louisiana, carried the check to Alexandria, the home of Mr. Novo, and tendered it to him. He declined the tender demanding that the check be made payable to him only. This was refused. Whereupon Mr. Novo had a fieri facias issued on the judgment and placed in the hands of the Sheriff of Rapides Parish for execution. The writ was satisfied in the Sheriff's hands without seizure, and the fund realized therefrom, viz., $3941.39, paid over to the defendant. On February 19, 1938, he drove to plaintiff's home in Franklin Parish, over 100 miles from Alexandria, and the settlement herein complained of and attacked was made.

It is conceded that the defendant, pursuant to a definite agreement with plaintiff, was entitled to receive 40% of the amount of any judgment recovered in the case. Defendant contended on the date of the settlement that while plaintiff was a patient of the Central Louisiana Hospital for the Insane, in Pineville, and while the case was pending in this court, an additional agreement was reached between them whereby the fee due him, in event of the successful outcome of the suit, was increased to 50% of any judgment recovered. At the time of settlement, he also contended that a deduction of $100 for his expenses to New Orleans to deliver to the Supreme Court the application for a writ of review in the case, should be made, and likewise a deduction of $40, the cost of printing briefs for the use of the Supreme Court. He made a further deduction of $400, which he now contends was paid by him as a fee to an attorney in New Orleans to assist him to win the case in the Supreme Court.

These three amounts, totalling $540, were deducted from the $3941.39 and the bal-

ance of $3401.39 divided equally. Defendant issued to plaintiff his personal check for $1700.69, which was in due course collected.

As soon as plaintiff's agent, W. D. Searcy, could get in touch with Judge S. R. Holstein, his local counsel and personal friend, who resides in Winnsboro, Louisiana, and the settlement discussed, he was advised that the basis of the settlement was incorrect and that defendant was due plaintiff more money. Judge Holstein was then engaged to make demand upon defendant for the amount he is alleged to have wrongfully deducted from plaintiff's portion of the judgment. Demand was made by letter of date February 23, 1938. This was refused. The present suit followed. It was filed on March 9, 1938. The amount sued for is in excess of the demand embodied in the letter.

The following is an epitome of the original petition in the case:

That due to physical disability, fully reflected from the opinions of the Supreme Court and the Court of Appeal, above referred to, plaintiff was unable to personally attend to and transact business, such as the employment of counsel, locating and conversing with witnesses, necessary to the prosecution of the suit he contemplated instituting against the Interurban Transportation Company, Inc., et al., and for said reason engaged his brother, W. D. (Will) Searcy, as his agent to represent and act for him; that said agent went to Alexandria and consulted with defendant with regard to handling the case on a contingent fee basis and reached an agreement with him whereby he was to file and prosecute the suit to final judgment and receive for his pay 40% of the amount recovered, from which amount defendant agreed to pay all "expenses incidental to the trial and conclusion of the trial of said cause"; that it was further agreed with defendant that said agent, W. D. Searcy, would personally interview the witnesses on behalf of plaintiff preceding the trial of the case, ascertain their knowledge of the facts thereof, and assemble them for the trial and, in the event of recovery, defendant herein would reimburse his expense from that portion of the judgment coming to him; that said agent performed his part of the said agreement with defendant and, in doing so, visited four different parishes of the State, and incurred an expense account aggregating $346, which defendant is obligated to pay; that said defendant came to plaintiff's home, where he is confined as an invalid, and handed him a check only for the sum of $1700.69, stating that this was all that was due him and stating further that he had "charged against the judgment the sum of $140.00 for briefs and the trip before the Supreme Court in New Orleans, as well as the further sum of $400.00 that he had paid to other parties, none of whom were entitled to anything; such action on his part, if true, not being condoned or ratified on the part of petitioner"; that petitioner was due and entitled to receive 60% of the amount collected on the judgment, or $2364.83, and the additional sum of $346, the amount of expenses incurred as above described.

He further alleges:

"That petitioner has been imposed on by the said Lee J. Novo, to the extent of the sum of $1000.00, which amount the said Lee J. Novo, has unjustly withheld from your petitioner."

He prays for judgment for the sum of $1000. There are alternative allegations and a prayer consonant thereto, but these need not be analyzed or discussed, in view of the conclusion we have reached on the merits of the case.

Defendant excepted to the petition on the ground that it disclosed neither a cause nor a right of action. Prior to the consideration of this exception by the court, plaintiff filed a supplemental and amended petition which, due to the fullness of its allegations and the important bearing the facts therein set up have upon the merits of the case, we here reproduce in full:

"Into Court now comes Rev. A. Cliff Searcy, through his undersigned counsel, plaintiff in the above styled and numbered cause, and with leave of the court first had and obtained, files this, his supplemental petition and shews to the court:

"1. That up to and on the occasion of the visit of the defendant, Lee J. Novo, to the home of your petitioner in Franklin Parish, your petitioner had the utmost confidence in him and trusted him implicitly.

"2. That when on that occasion the said Novo, in his pretended settlement with petitioner, as set forth in paragraph 7 of his original petition, handed to your petitioner a check for $1700.69, he said to your petitioner:

"(a) That the original contract of employment had been changed from 40% to 50% as the part to be received by the said Novo on the occasion of the said Novo's visit to petitioner while he was a patient in the Central Louisiana Hospital for the Insane at Pineville, Louisiana.

"(b) That the said Novo had paid the sum of $400.00 to other parties in the city of New Orleans to insure the success of the case in the Supreme Court.

"(c) That the cost of printing a brief in the case and his personal expenses on a trip to New Orleans to file the writ of certiorari with the Clerk of the Supreme Court amounted to the sum of $140.00.

"3. That after the said Novo had made these statements, he handed to petitioner a check for $1700.69, declaring it was all that petitioner was entitled to, and at the same time he prepared and handed to your petitioner a receipt drawn by him, which receipt was an acknowledgment by petitioner that the said sum of $1700.69 was in full settlement of all the petitioner was entitled to; that petitioner took the said check and signed the said receipt and delivered it to the said Novo.

"4. That as stated above, up to this time petitioner had implicit confidence in the said Novo and trusted him absolutely; that notwithstanding this confidence and trust on the part of petitioner, your petitioner felt that the settlement was not fair; that he knew that he had never consciously consented to a change in the contract while he was a patient in the Central Louisiana Hospital, in Pineville, Louisiana; that he also knew that if it was necessary for the said Novo to use $400.00 as he said in New Orleans, Louisiana, that the said amount should not have been charged to plaintiff, but should have been paid by the said Novo out of his part; but that in his weakened mental and physical condition, he was unable to resist the statements and demands of the said Novo and was powerless to do anything at the time other than to accept the said check and to sign said receipt as demanded.

"5. That the representation to petitioner to the effect that the contract had been changed from 40% to 50%; that the $400.-00 was rightfully paid to anyone in New Orleans to insure the success of the case before the Supreme Court, and that the legitimate expense of a trip or trips to New Orleans, Louisiana, and the printing of a brief amounted to $140.00 was false and fraudulent and was also a gross imposition upon petitioner in his helpless and weakened condition.

"6. That because of the said fraud and imposition practiced upon him by the said Novo, your petitioner is not and cannot be bound in law by having accepted a check for less than was justly and legally due him; nor can he be estopped by having signed a receipt drawn by the said Novo which purports to acknowledge that the said smaller sum was all that was due to petitioner out of the $3941.38 collected under the judgment that was rendered in his favor.

"7. That petitioner adopts and reiterates and reaffirms each and every allegation of his original petition as completely and fully as though they were rewritten herein except insofar as they may be modified by the averments of this supplemental petition.

"Wherefore, petitioner prays that he be allowed to file this supplemental petition; that the same be served with a citation upon the defendant as required by law; that after the expiration of all legal delays and upon a trial hereof, there be judgment in favor of your petitioner against the said Lee J. Novo in the full and true sum of $1000.00, with interest thereon at the legal rate from judicial demand until, paid, together with all costs of this suit."

Defendant filed a motion to strike out this supplemental petition for the following reasons, to-wit:

That same changes the issues of the case and may not be filed pending disposition of the exception of no cause and no right of action; that it injects new issues into the case; that all the facts therein set out and allegations made should have been incorporated into the original petition. The motion to strike out was denied and the exception was finally overruled. It is here urged that these rulings are incorrect.

Defendant admits the settlement with plaintiff, as alleged, but denies specifically all the other allegations of the original petition designed to serve as a basis of recovery by plaintiff. Answering the supplemental petition articularly, he says:

Article 1. That he "at no time gave plaintiff any cause to have anything but confidence (in him) and that was illustrated through the entire case and settlement of the case."

Article 2. Denied, except as hereinafter further shown and explained.

Article 3. Denied; and further answering, he says:

That he made out and delivered to plaintiff the check for $1700.69 "after a careful accounting of all funds, deduction of costs, and settlement as per the agreement made by petitioner and defendant with regard to the fees and expenses, etc.; that all acts of the said settlement were condoned, ratified and confirmed by the said plaintiff, and it was only after the money had been received that this attempt was made to bring this suit."

Article 4. Denied, except as hereinafter explained.

Article 5. Denied, except as hereinafter explained.

Article 6. Denied, except as hereinafter explained.

Article 7. Denied, except as hereinafter explained.

Further answering, defendant pleads:

"19. Further answering, your defendant shows that all agreements made by the defendant were made with Dr. Searcy, in person, concerning the final contract of employment and concerning the various stages of the proceedings; that during the course of the litigation and more definitely on May 29, 1937, your petitioner wrote your defendant a letter wherein he instructed your defendant to have nothing to do with his brother, W. D. Searcy, known as Will Searcy, and that petitioner was willing to accept in full settlement of his claim, $1000.00, and that the petitioner instructed your defendant to look out for himself and that he would be satisfied on the obtaining of $1000.00 payable to him; he also instructed your defendant that his brother, Will Searcy, otherwise known as W. D. Searcy, had refused to talk to him anyway and that your defendant, as his attorney, should continue to deal with him, the petitioner herein, directly."

"21. That your petitioner, Rev. A. Cliff Searcy, executed in favor of your defendant a release, which reads as follows, to-wit:

"'February 19, 1938.

"'Received of Lee J. Novo, Attorney, full and final settlement of suit Rev. A. Cliff Searcy v. Interurban Transportation Company et al, this 19th day of February, 1938.

"'(Signed) Rev. A. Cliff Searcy.'

"22. That your defendant acted as instructed, made a full disclosure of all funds received, gave a full accounting, received a full and final receipt and acknowledgment of the settlement made with the Rev. A. Cliff Searcy; that this settlement is presently binding upon the parties thereto as no effort has ever been made to set said settlement aside; that every act done and performed by your defendant was done with complete disclosure of all facts concerning and surrounding said acts, and that the settlement was accepted, ratified and confirmed, and the check covering said settlement was cashed, as hereinabove shown, and the money accepted in settlement."

He further pleads that under said letter of date May 29, 1937, wherein plaintiff expressed the willingness to accept $1000 net to him by way of compromise in full settlement of his interest in the pending suit, it was not obligatory upon defendant to pay to plaintiff more than that amount from the judgment finally recovered. The settlement with plaintiff and payment thereunder are specially pleaded in *satisfaction* of any and all claims herein sued for.

The lower court rejected plaintiff's demand for the $356, but gave him judgment for $664.14. The court found and held that the original contract between the parties had not been revised upward as to the fee and that no part of the other items totalling $540 should have been charged to plaintiff.

Defendant prosecutes this appeal.

■ There is no merit in the motion to strike out the supplemental petition on the grounds set up. It is well settled that prior to the joining of issue, a petition, otherwise radically defective and vulnerable to such an exception, may be amended with small or no limitation to disclose a cause of action, and this too of a dissimilar character to that originally sought to be set up. Article 419, Code of Practice; Faulkner v. Milner-Fuller, Inc., La.App., 154 So. 507; and cases therein cited; also Commercial National Bank v. Smith, 150 La. 234, 90 So. 581; Self v. Great Atlantic & Pacific Tea Company, 178 La. 240, 151 So. 193; Reeves v. Globe Indemnity Company, 185 La. 42, 168 So. 488.

■ The supplemental petition being timely filed and properly allowed by the court must be considered in conjunction

with the original petition in determining whether a cause or right of action is disclosed. The defects of the former, if any, may be cured by the virtues of the latter. This appears to be an elementary principle. It is supported by some or all of the authorities above cited. However, appellant did not except to the supplemental petition but contented himself with the motion to strike. Therefore, whatever merit the exception originally had, has been effectually destroyed by the allegations of the supplemental petition which adopts and reaffirms the allegations of the original petition, save wherein they may conflict.

The petition as amended clearly discloses the facts and nature of the settlement attacked therein. In effect, if not by express, definite wording, plaintiff seeks to have the settlement set aside to a material extent because of the alleged imposition practiced upon him by defendant and because of the false and fraudulent representations made by defendant in order to induce plaintiff to accept the terms of the settlement submitted and urged by defendant.

Exceptor also argues that the exception is well founded for these reasons:

1. That it is not alleged that the delegation of the authority from plaintiff to W. D. Searcy to employ counsel and fix the fee for his services, etc., is in writing; and

2. That as a condition precedent to the action to annul the settlement, plaintiff should have tendered back to defendant the amount he received in the settlement.

■■ No authority to support the first proposition is cited. We are sure such an agency may be created by oral agreement, as well as by written evidence. Article 2992 of the Civil Code specifically provides that powers of attorney may be given orally. This is the rule. Laws requiring that such authority be evidenced by writing create exceptions to the rule. If the contract entered into under a power of attorney may be executed by parol, proof of the power of attorney may be by parol. Hammonds v. Buzbee, 170 La. 573, 128 So. 520.

■ The second proposition is unsound. Authorities are cited in its support wherein it has been held that before attacking an act of compromise, that which has been received therefrom by a complainant should be tendered back prior to instituting suit to annul the compromise. This case involves no compromise whatever. It only involves a settlement between attorney and client in which the client charges that the attorney is withholding from him money he claims belongs to him.

■ On the merits, the lower court has favored us with written reasons for judgment, wherein the issues of fact and principles of law raised by the pleadings are painstakingly and exhaustively discussed.

Appellee has not answered the appeal; therefore the correctness of the rejection of the claim of $346 is not before us. In fact, appellee in brief asks that the judgment be affirmed.

After defendant and W. D. Searcy, as agent for plaintiff, reached an agreement for the handling and prosecution of the case, plaintiff, at defendant's request, was carried by automobile to Alexandria to confirm the contract. He was unable to walk. Defendant was notified of his presence and came from his office to the automobile and there, in the presence of W. D. Searcy and a friend, the agreement was discussed and confirmed. Plaintiff suggested that it be reduced to writing, but defendant said such was unnecessary as there were witnesses to it. Thereafter, at least until trial in the lower court, defendant was in constant touch and communication with W. D. Searcy concerning the case, and relied upon him almost if not entirely to do the field work necessary to have the case ready for early trial. After the trial it was not necessary to continue such close relations. However, defendant wrote him on August 9, 1937, that the application for a writ of review had been filed in the Supreme Court, and again on November 22nd following, advising that the case had been set for hearing in that Court on December 6th. He mailed to W. D. Searcy and plaintiff each a copy of the printed briefs filed in the Supreme Court. It would appear from these facts that W. D. Searcy was kept well posted by defendant concerning the progress of the case, even subsequent to final decree in this court. This effectively refutes defendant's contention that after receiving a letter from plaintiff, of date May 29, 1937, in which some criticism of W. D. Searcy is made, he thereafter dealt solely with plaintiff in all matters concerning the case.

■ Defendant failed to establish by a preponderance of the evidence that his

fee was raised above the amount originally agreed to. Plaintiff is positive he made no such agreement. W. D. Searcy is equally positive he agreed to no such change. Both testified that the first they heard of the change was when defendant raised it at the time the settlement was made. If the change had been made, it seems most reasonable that either plaintiff or defendant or both would have informed W. D. Searcy of it. The fact that the change is asserted to have taken place while plaintiff was in said hospital for treatment, presumably for mental deficiencies, casts a mist of suspicion over defendant's contention. Defendant says he urged upon plaintiff as a reason for the increase in fee the heavy volume of work done by him in the case. It does not appear that his labors were more onerous than could have originally been contemplated. In addition, he had the active assistance of two attorneys who, in the beginning, it was not known would be associated with him. Pertinent to this phase of the case, we quote the following resume of facts found by the trial judge:

"As to the contention of Mr. Novo that he had a second agreement and contract with Rev. Searcy by which he was to receive 50% of the amount to be recovered after all expenses were deducted, the court is of the opinion, from the testimony as a whole in this respect, that Mr. Novo has failed to substantiate his claim. He testifies that he had the agreement with Rev. Searcy while the latter was a patient, it appears, in the State Hospital in Pineville. While it has not been shown that Rev. Searcy was under interdiction at the time, the inference is strongly suggestive that he was. There is an abundance of testimony in the record showing that Rev. Searcy was practically an invalid, a hopeless cripple, and had been since he had a stroke on the bus of the Interurban Transportation Company, which brought about his damage suit; that he has during this time been highly nervous; that his condition has been such that he was unable to attend to business and had to get his brother to look after the employment of counsel to institute the damage suit and to represent him generally throughout the proceedings. The court observed him during the trial of the present case. He was to all appearances helpless, had to be brought bodily into the court room, waited upon while there and carried away as would a helpless child. He appeared to be very nervous, especially while testifying; apparently overcome at times from his nervous condition. Mr. Novo undoubtedly has had at all times knowledge of this condition of the said Searcy."

Defendant testified that plaintiff gave him plenary authority to employ additional counsel to assist him prosecute the case, and at plaintiff's expense. In other words, to be paid out of plaintiff's part of the judgment if any was recovered, and that in keeping with this authority, he did employ a reputable lawyer of New Orleans and paid him $400 for his services and counsel. However, that attorney's name does not appear in the record anywhere. Defendant said that this lawyer, in a way, was representing plaintiff in the case. He refused to divulge his name, although prodded at length to do so. His position on this issue is best reflected from the following questions and answers thereto given by him:

"Q. Then you did at the request of Dr. Searcy and under the authority that he had given you, hire another lawyer at a specified fee of $400.00? A. Yes.

"Q. He was Dr. Searcy's lawyer then, was he not? A. Well, he was in a way representing Dr. Searcy. Yes, sure he was.

"Q. Then who was that man? A. I do not wish to say.

"Q. Do you refuse to say? A. I do.

"Q. Do you not think that if you are going to take $400.00 of this old man's money and pay it to a man in New Orleans to help you that he has the right to know to whom you paid it? A. *No, I don't. He has no right to know because every time I make a connection, somebody runs around and I lose the connection.*"

We disagree with defendant's theory of his rights as regards divulgence of the name of this attorney, whom he says he employed for the plaintiff and to whom he paid money he expects plaintiff to refund to him. By no stretch of the imagination was defendant authorized to commit plaintiff to liability to any attorney for a cash fee. What would have been the situation had plaintiff not won the case? He is a very poor man. Defendant himself had the case on a contingent fee basis.

It was defendant's plain duty as attorney for plaintiff before demanding payment from him of any part of this $400, to make a complete disclosure of

all the facts pertinent thereto, even though it be conceded that defendant had the right to commit plaintiff to liability therefor. It is absurd to say that a person has the right to incur liability for your account and in the same breath contend that you have no right to be informed fully of the nature of such liability and to whom due.

In regard to this charge of $400 and the other two items of $100 and $40, respectively, and other issues of the case and contentions advanced by defendant, we quote with our entire approval the following from the written reasons for judgment, of the trial judge:

"As to Mr. Novo's contention that the deduction of $400.00 for expenses in connection with assistance which he testifies he employed to help him with the case before the Supreme Court, the court cannot bring itself to the point of agreeing with his position in this respect. His position is that Rev. Searcy's letter of May 29, 1937, gave him such authority. The court's interpretation of that letter is that it was meant and written purely with the view of a possible compromise of the case. In the event of a compromise, Rev. Searcy would have been bound to accept $1000.00, but that amount would have been net to him—no deductions to be allowed for extra counsel or for any other expenses incident to the litigation. The court thinks it certainly is rather absurd for Mr. Novo to take the position that the $400.00 should be deducted from Rev. Searcy's share of the proceeds of the judgment. Rev. Searcy emphatically denies that such was his understanding or intent when he wrote the letter, or at any other time. Considering all the circumstances as disclosed by the testimony, the court is of the opinion that the $400.00 was not a proper or legitimate charge against Rev. Searcy, but that it must be borne by Mr. Novo himself.

"As to the item of $140.00 for expenses for brief and trip to New Orleans, there does not appear, so far as the court can find, that there was any definite agreement or understanding between the parties as to how the expenses of that nature should be paid. In the absence of such agreement the court is inclined to the view that these items are properly chargeable to Mr. Novo himself; therefore his claim for deduction of them will be disallowed.

"As to defendant's contention that Rev. Searcy voluntarily accepted $1700.69 in full settlement and signed a receipt, and cashed the check given him, that transaction, of course, presents a rather serious defense. There are several circumstances, however, which when taken into consideration in connection with this settlement, the court thinks should operate to set same aside and call for an adjusted settlement.

"In the first place, it is evident to the court that Rev. Searcy was justly entitled to more than he received. He was entitled to 60% of the proceeds of the judgment and Mr. Novo to only 40%, whereas Mr. Novo settled with him on the basis of fifty-fifty.

"In the second place, Rev. Searcy was a sick man, in a highly nervous condition, and apparently easily over-persuaded into agreeing to Mr. Novo's representations as to the deductions and fifty-fifty percentage basis settlement of the remainder. It does seem that it was only fair that Mr. Novo should have had Mr. W. D. Searcy present in the beginning to aid and assist Rev. Searcy in this, as he had done during the progress of the litigation. No one knew any better than Mr. Novo did that it was Mr. W. D. Searcy who had in the very beginning employed him, for the simple reason that Rev. Searcy was himself unable to do so intelligently and properly; and W. D. Searcy had taken the lead throughout the entire proceeding and course of the litigation in doing the things for his brother that were and are necessary for a client and litigant to do in a law suit. It is true, that Mr. Novo claims that Rev. Searcy had fallen out with his brother, which fact he contends warranted him in disregarding the brother and subsequently conferring with Rev. Searcy directly. But this is strenuously denied by both Rev. Searcy and his brother. Mr. Novo testifies that he endeavored to get in touch with Mr. Will Searcy when he went over to make the settlement with Rev. Searcy, but could not find him. That fact is strongly indicative of the fact that Mr. Novo realized himself that Will Searcy should be there for the settlement. Mr. Searcy, it appears, was in Winnsboro at the very time and by accident was informed of Mr. Novo's arrival and went home at once. Mr. Novo contends that since Will did come in and was actually present when the settlement was finally consummated, he could then, if he so desired, enter any objections he saw fit. Mr. Will Searcy, on the other hand, testified that when he arrived his brother was in a delirious condition and had been that way all the night

before and all that day until he, Will Searcy, left; that what Mr. Novo had told him, Rev. Searcy seemed to agree, and that he, Will Searcy, could do nothing with his brother. He states in another part of his testimony that when Mr. Novo said he had to pay the Supreme Court $400.00, and he, Will Searcy, remarked to Novo,—'Mr. Novo, do you mean to say you paid the Supreme Court $400.00?' And during the rather spirited conversation he and Mr. Novo were having, in which Will was apparently protesting, his brother got nervous and he, Will, 'just hushed up and didn't say any more.' Then later, when Will was riding back to town with Mr. Novo, Will states that he protested vigorously against the manner of the settlement, and told Mr. Novo he was not going to stand for it. He states also that Mr. Novo finally told him to come over to Alexandria and he would fix it up with him. The court's view is that, had Mr. Novo contacted Mr. Will Searcy at first and carried him over to the home; it is more than likely that through Will's efforts and advice to his brother, before his brother had practically given away to Mr. Novo's representations, the settlement would either have not been had at all at that time or, if had, Mr. Novo would have paid Rev. Searcy more than was paid.

"Furthermore, the fact that Mr. Novo actually paid Rev. Searcy $1700.69 instead of $1000.00, which Mr. Novo claims he could have done, indicates that Mr. Novo, in his own conscience, felt that he had no right to pay merely the $1000.00.

"Considering all the circumstances, the court is of the opinion that Rev. Searcy was not in a condition to fairly realize the extent of his rights and that, if he did in a manner understand to any extent, he was improperly led by Mr. Novo into error as to his right, and was over-persuaded to accept the settlement which he did. An attorney at law occupies a fiduciary relationship with his client with respect to all funds coming into his hands in which his client has an interest. He should account to his client in a meticulous manner for all such funds. It is necessary and usual for an attorney to advise his client fully as to his rights as an attorney, but in no case is an attorney justified in collecting or attempting to collect by deduction or otherwise any fee which they have agreed upon without the client being first fully advised as to all his rights in the premises. Any departure from the above constitutes a breach of trust, which should not and will not be countenanced by any court of justice.

"And in this case the plaintiff was obviously unable to deal with anyone on a basis of mental equality. It was necessary, therefore, that he should place the utmost trust and confidence in someone. What was more natural than that he should place this trust in his own counsel? By reason of his weakened condition, both mentally and physically, he needed all the more the sympathetic aid and assistance of counsel who would refuse in the moment of triumph to let his own interest intrude.

"The court cannot further refrain from observing, much as it regrets to do so, that at the very moment the original contract was alleged to have been revised upward in counsel's favor, the plaintiff was in a hospital for the mentally afflicted which, in itself, should convince anyone that plaintiff was not able to deal at arm's length with such counsel in a matter where their respective interests were in conflict. In the light of this record, the court cannot express its disapproval too strongly of defendant's conduct as therein reflected.

"For these reasons, therefore, the court does not think plaintiff should be compelled to abide by the settlement which, in the opinion of this court, was manifestly prejudicial to him."

The law leaves no uncertainty in defining the character of duty which an attorney owes to his client. The relation of attorney and client is more than a contract. It superinduces a trust status of the highest order and devolves upon the attorney the imperative duty of dealing with the client only on the basis of the strictest fidelity and honor.

Pertinent to these principles, we quote the following from 7 Corpus Juris Secundum, Attorney and Client, §§ 125, 133 and 139:

"In advising his client and conducting the latter's affairs, an attorney is bound to exercise that reasonable care and diligence which is usually exercised by lawyers and must possess and employ the ordinary legal knowledge and skill which is common to the members of his profession. (See infra §§ 140–146). This, however, is not the full extent of a lawyer's duties or obligations to his client; he is, in addition, bound to conduct himself as

a fiduciary or trustee occupying the highest position of trust and confidence, so that, in all his relations with his client, it is his duty to exercise and maintain the utmost good faith, honesty, integrity, fairness and fidelity."

"An attorney is under an absolute duty to give his client a full, detailed and accurate account of all money and property which has been received and handled by the attorney as such, and must justify all transactions and dealings concerning the same. Mere general statements will not suffice, and hence it is incumbent upon the attorney to keep complete and accurate books and records."

"An attorney who has collected money for his client and not yet paid it over ordinarily holds the same as a trustee rather than a debtor, and his duties and liabilities with respect thereto are much the same as any other bailee, trustee, or fiduciary."

See also American Jurisprudence, Vol. 5, § 45.

As regards the burden of proof in litigation between attorney and client wherein the correctness of a settlement is assailed by the client, American Jurisprudence, Volume 5, page 289, § 50, succinctly lays down the rule to be as follows:

"When a transaction between an attorney and his client is attacked, the burden is cast upon the attorney to prove that it was not influenced by the relationship. He must show that it was made in the best of faith and without disadvantage to his client, that it was fair and equitable, and that the client was fully informed of his rights and interest in the subject-matter of the transaction, of the nature and effect of the transaction itself, and was so placed as to be able to deal with the attorney at arm's length."

Treating of the relation of attorney and client and the transcendent character of the fidelity due by the attorney, and the burden of proof when a transaction between them is attacked, 2 Ruling Case Law, page 966, § 42, admirably lays down the rule as follows:

"The relation gives to the attorney great influence and control over the actions and interests of his client, *and in view of such fact, all dealings between attorneys and clients will be closely scrutinized by the courts, and transactions between them are often declared to be voidable which would be deemed unobjectionable between other persons.* The burden is on the attorney to show that the transaction is fair and equitable, and that the client was fully informed of his rights and interests in the subject-matter of the transaction, and of the nature and effect of the transaction itself, and was so placed as to be able to deal with the attorney at arm's length."

See also Gwin v. Fountain, 159 Miss. 619, 126 So. 18, 22, 132 So. 559; Parkerson v. Borst, 5 Cir., 264 F. 761, 765; Berman v. Coakley, 243 Mass. 348, 137 N.E. 667, 26 A.L.R. 92, 96.

In Thweatt et al. v. Freeman, 73 Ark. 575, 84 S.W. 720, there is a very lucid and intelligent discussion of the relation of attorney and client by Justice McCulloch. Reduced to its essence, what he said therein is reflected from the syllabus, to-wit:

"An attorney is bound to give his client his best judgment and advice, and in transactions between the parties the burden is on the attorney to show absence of undue influence, and that the client was given all the information and advice that was necessary to enable the client to act understandingly."

We fully agree with the finding of the lower court that, due to plaintiff's weakened mental and physical condition and through error of his real rights, he was induced to approve the settlement, in a manner forced upon him by defendant, then the custodian of the common funds.

Error and/or fraud in contracts negatives the idea of free consent. Their existence, when timely presented to a court of justice, frees the victim of any obligation incurred by or through their influence. Civil Code, Articles 1819, 1821, 1847.

In Ashley v. Schmalinski et al., 46 La. Ann. 499, 15 So. 1, it was held, as reflected from the syllabus:

"The law will not maintain a contract, the consent to which, of one of the parties, is the result of error as to the substance of the contract,—the error being caused by artifices and fraudulent representations of the other party,—or if the frauds (not his directly) have been participated in or made effective by him. Rev.Civ.Code, Arts. 1847, 1848; 1 Story's Eq.Jur. §§ 189, 191 [192] 193, 195."

To the same effect are Schmitz v. Peterson et al., 113 La. 134, 36 So. 915; H. C. Newman, Ltd., v. Scarborough, 115 La. 860, 40 So. 248, 112 Am.St.Rep. 278.

For the reasons herein assigned, the judgment appealed from is affirmed with costs.