974 So.2d 1266 (2008)
Michael A. TEAGUE, M.D.
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, St. Paul Insurance Company, Seale, Smith, Zuber, and Barnette, Donald Zuber, Catherine Nobile, Catherine Lauffer, and ABC Insurance Agency.
No. 2007-C-1384.
Supreme Court of Louisiana.
February 1, 2008.
Rehearing Denied March 7, 2008.
*1268 Nelson & Hammons, John Layne Hammons, Shreveport, for applicant.
Keogh, Cox & Wilson, Stephen R. Wilson, Baton Rouge, for respondent.
KNOLL, Justice.
This legal malpractice action presents the question of whether knowledge of an undesirable result is sufficient to trigger the running of peremption under La.Rev. Stat. § 9:5605. The plaintiff, a physician who was sued by his patient for medical malpractice, filed the instant suit against his defense attorneys for legal malpractice in effecting the settlement of his patient's case against him. Plaintiff filed suit over one year after learning of the negative result of their representation in the underlying medical malpractice suit, but well within one year from the alleged date of the discovery of the legal malpractice. After trial by jury, which resulted in a favorable judgment for the plaintiff, defendants filed a peremptory exception of peremption, which the district court denied. On appeal, the defendants again filed a peremptory exception of peremption, which the court of appeal sustained, reversing the district court's judgment and dismissing the plaintiff's action with prejudice. We granted this writ to determine whether plaintiff's action was perempted. Michael A. Teague v. St. Paul Fire and Marine Ins. Co., et al., 07-1384 (La.10/5/07), 964 So.2d 375. For the following reasons, we reverse the court of appeal's judgment, finding knowledge alone of a bad result is not sufficient to trigger the running of peremption under La.Rev.Stat. § 9:5605. More evidence is required to show that the client knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of legal malpractice.

FACTS AND PROCEDURAL HISTORY
The plaintiff, Michael A. Teague, M.D., was sued in 1997 by a former patient for medical malpractice after a medical review panel had unanimously concluded that no breach of professional standards occurred in the course of his treatment. Dr. Teague's malpractice insurer, St. Paul Insurance Company ("St.Paul"), assigned the defense of the suit to the law firm of Seale, Smith, Zuber & Barnette, L.L.P. Donald Zuber, one of the firm's partners, answered the suit on behalf of Dr. Teague, denying liability and requesting trial by jury. Mr. Zuber subsequently delegated the handling of the litigation to an associate, Catherine Nobile.
*1269 On April 19, 1999, the district court issued a case management schedule order, setting a three-day jury trial beginning on January 25, 2000. The order also fixed a deadline of August 1, 1999, for the filing of a jury bond by the defendants. It is undisputed that Ms. Nobile failed to file the required jury bond by the deadline established in the order, thus resulting in the loss of the right to a jury as the trier of fact. The record clearly shows defense counsel never informed Dr. Teague of the failure to post the jury bond and, indeed, decidedly withheld that information from him, even though St. Paul was promptly informed.
On Friday, October 29, 1999, the parties' attorneys participated in the mediation of the case. It is undisputed that Dr. Teague was never informed that mediation would take place. As the result of the mediation, a settlement agreement was reached that day, whereby St. Paul agreed to pay the plaintiff $50,000 to compromise her claim against Dr. Teague. Notably, Dr. Teague's policy with St. Paul did not contain a "consent to settle" clause, which would have required the insurer to obtain Dr. Teague's consent to any proposed compromise of a malpractice claim covered by the policy. That afternoon, Ms. Nobile telephoned Dr. Teague's office and left a message for him, advising that the case had been settled. Dr. Teague returned Ms. Nobile's call that same afternoon and confirmed that the case had been settled as the result of the mediation.
On Monday, November 1, 1999, Dr. Teague telephoned Mr. Zuber, discussed the settlement, and expressed his dissatisfaction that the case was settled rather than tried. The formal settlement release was executed by the plaintiff on November 5, 1999, and the lawsuit was subsequently dismissed.
Dr. Teague instituted the present litigation against Mr. Zuber, Ms. Nobile, and Seale, Smith, Zuber & Barnette, L.L.P. ("defendants") on November 3, 2000.[1] In his petition, Dr. Teague alleged that an attorney-client relationship existed between him and the defendants in the prior medical malpractice action, that the defendants failed to properly investigate and defend that action, that they failed to keep him informed of significant developments affecting his interests, that they negligently forfeited his right to trial by jury, and that they engaged in a conspiracy to conceal their professional neglect by effecting the settlement of the medical malpractice claim. Dr. Teague further alleged that "as a direct consequence of the settlement," St. Paul reported that settlement to the National Practitioner Data Bank ("NPDB").[2] Notably, St. Paul initially *1270 reported the settlement was for operating on the wrong body part. Dr. Teague's dissatisfaction with this report prompted him to seek other counsel, which in turn led to his discovery of the defendant's legal malpractice. Finally, he claimed that as the direct result of the defendants' negligence and breach of professional duties, he sustained damages consisting of "injury to business reputation, unwarranted expense associated with obtaining malpractice insurance at a higher premium, loss of income, past and future embarrassment, humiliation, and mental anguish." While admitting certain facts alleged in the petition, such as the failure to post the jury bond, the defendants denied any liability.
Dr. Teague subsequently amended his petition to allege that the defendants violated Rule 1.4 of the Louisiana State Bar Association Rules of Professional Conduct "by failing to keep [him] advised of all pertinent developments in his case and by intentionally concealing from him the fact that they had waived his constitutional right to trial by jury through their negligence in failing to post the required jury bond in a timely manner."
The case was subsequently tried before a jury over the course of three days. The jury found the defendants liable to Dr. Teague, assessing 70% fault to Ms. Nobile and 30% fault to Mr. Zuber, and awarded plaintiff $138,500 in damages. The district court's judgment incorporating the jury's verdict was signed on November 29, 2005. On December 6, 2005, the defendants filed a post-trial peremptory exception of peremption and prescription, arguing that based upon the evidence at trial, including Dr. Teague's own testimony, his cause of action was perempted prior to the date he filed suit pursuant to the provisions of La.Rev.Stat. § 9:5605. The defendants also filed a motion for judgment notwithstanding the verdict on various alternative grounds. The exception and motion were both denied in separate judgments signed on March 10, 2006.
The defendants thereafter suspensively appealed all the judgments of the district court, and on August 21, 2006, they filed another peremptory exception of peremption in the court of appeal, reasserting that defense. While the appellate court acknowledged the importance of the substantive legal and ethical issues presented in the appeal, it found it unnecessary and inappropriate to reach those issues, for the simple reason that the matter had to be resolved on the procedural basis of peremption. Teague v. St. Paul Fire and Marine Ins. Co., 06-1266 (La.App. 1 Cir. 6/8/07), 964 So.2d 1015. Finding plaintiff's action was perempted, the court reasoned:
Upon receiving notice that the supposedly "specious" suit against him had been settled at mediation, Dr. Teague certainly had notice "enough to excite attention and put [him] on guard and call for inquiry." And such notice was "tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," including any predicate events or prior acts which supposedly prompted the settlement. Thus, the fact *1271 that Dr. Teague was unaware at the time he was informed of the settlement of the defendants' earlier failure to file the jury bond does not serve to stop the "peremption clock," or to reset it upon his acquiring that information. (Citations omitted).
Teague, 06-1266 at p. 6, 964 So.2d at. p. 1021. The court of appeal concluded that the peremptive period of Dr. Teague's cause of action commenced on October 29, 1999, the day he learned of the settlement. Because his action was indisputably filed over a year after that date, the court of appeal sustained the exception of peremption, reversed the district court's judgment, and dismissed plaintiff's cause of action with prejudice and at his cost.

LAW AND ANALYSIS
In no other agency relationship is a greater duty of trust imposed than in that involving an attorney's duty to his client. Scheffler v. Adams and Reese, LLP, 06-1774, p. 13 (La.2/22/07), 950 So.2d 641, 652. "Louisiana law recognizes that an attorney's paramount duty is, and must be, to his client." Id. This fiduciary duty obligates the attorney to exercise at least that degree of care, skill, and diligence exercised by prudent attorneys practicing in his community or locality. Ramp v. St. Paul Fire & Marine Ins. Co., 263 La. 774, 786, 269 So.2d 239, 244(1972); Morgan v. Campbell, Campbell & Johnson, 561 So.2d 926, 929 (La.App. 2d Cir.1990). Though he is not required to exercise perfect judgment in every instance, his license to practice and his contract for employment hold out to his client that he possesses certain minimal skills, knowledge, and abilities. Ramp, 263 La. at 786, 269 So.2d at 244; Morgan, 561 So.2d at 929. It so follows that "any professional misconduct, unreasonable lack of skill or fidelity in professional or fiduciary duties" constitutes malpractice. See Black's Law Dictionary "Malpractice" (6th ed.1997).
The law leaves no uncertainty in defining the character of duty which an attorney owes to his client. The relation of attorney and client is more than a contract. It superinduces a trust status of the highest order and devolves upon the attorney the imperative duty of dealing with the client only on the basis of the strictest fidelity and honor.
Scheffler, 06-1774 at p. 13, 950 So.2d at 651, quoting Searcy v. Novo, 188 So. 490 (La.App. 2d Cir.1939).
Significantly, this principle of strictest fidelity and honor is firmly embedded in the Rules of Professional Conduct (RPC), adopted by this court pursuant to our exclusive and plenary power to regulate the practice of law. La. Const. Art. II, §§ 1, 2. See also, Scheffler, 06-1774 at p. 13, 950 So.2d at 651. Recognizing fidelity and honor as essential elements of the lawyer's relationship to a client, Rules 1.1 and 1.3 require a lawyer to "provide competent representation to a client" and to "act with reasonable diligence and promptness in representing a client." Rule 1.4 of the RPC mandates that a lawyer "keep his client reasonably informed about the status of the matter" and "give the client sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued." Rule 2.1 of the RPC imposes an affirmative obligation upon a lawyer to "exercise independent professional judgment and render candid advice" to his or her client. This rule also underscores the importance of avoiding any divided loyalties that might cloud that independent judgment. Scheffler, 06-1774 at p. 14, 950 So.2d at 652
"As we have frankly acknowledged: `In no relationship is the maxim that "no man can serve two masters" more rigidly *1272 enforced than in the attorney-client relationship.'" Scheffler, 06-1774 at p. 13, 950 So.2d at 651, quoting Plaquemines Parish Commission Council v. Delta Development Company, Inc., 502 So.2d 1034, 1040 (La.1987). Indeed, this principle of undivided loyalty is also firmly embedded in Rule 1.7 of the RPC which generally prohibits a lawyer from representing a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests. Scheffler, 06-1774 at pp. 13-14, 950 So.2d at 651-52.
In a dual representation situation, the goal is full and equal representation of each client. State v. Baker, 288 So.2d 52 (La. 1973). Accordingly, the attorney owes to each client equally the imperative duty of dealing with his or her client only on the basis of the strictest fidelity and honor, and breach of this duty would constitute legal malpractice.
Before we address the issue of peremption under legal malpractice, we must first determine if defendants' conduct constituted legal malpractice. Louisiana jurisprudence provides that to establish a claim for legal malpractice, a plaintiff must prove: 1) the existence of an attorney-client relationship; 2) negligent representation by the attorney; and 3) loss caused by that negligence. Costello v. Hardy, 03-1146, p. 10 (La.1/21/04), 864 So.2d 129, 138.
Defendants admit they failed to post the jury bond timely and that while they informed St. Paul of this omission, they decided not to tell Dr. Teague. Defendants admit they did not inform Dr. Teague that because of the loss of a jury trial, they were going to attempt to mediate and settle the case. They admit it was not until after the case had settled that they informed Dr. Teague the case was mediated and settled. Notwithstanding these admissions, defendants claim they are not guilty of malpractice primarily because under St. Paul's policy, they did not need Dr. Teague's consent to settle his case.
It is undisputed that an attorney-client relationship existed between Dr. Teague and the defendants. Thus, it cannot be disputed that defendants owed Dr. Teague a fiduciary duty to legally represent him with integrity, skill, and due diligence, which encompassed keeping Dr. Teague reasonably informed about the status of his case. We fail to see how the ability to settle the case under the policy without Dr. Teague's consent lessens the obligations owed by the attorneys to their client. Indeed, it does not. It is most telling that defendants did keep St. Paul apprised of their omission, but yet decided not to inform Dr. Teague of their course of conduct and strategy in his case. Clearly, defendants breached a fiduciary duty they owed to their client by failing to keep him reasonably informed.
This same issue arose in Illinois wherein the Supreme Court there held that the attorneys who were employed by the insurer to represent both the insurer and the insured in a medical malpractice action against the insured, had a duty to make full disclosure to the insured in regard to their intent to settle the litigation without the insured's consent and contrary to his express instructions, regardless of the extent of the insurer's authority to settle without the insured's consent. Rogers v. Robson, Masters, Ryan, Brumund and Belom, 81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47, 49 (1980). The plaintiff in Rogers was a physician who was sued for medical malpractice arising out of a postoperative wound infection, which the patient alleged was due to the negligence and carelessness of the plaintiff. At the time of the alleged malpractice, Dr. Rogers was insured by Employer's Fire Insurance *1273 Company, and attorneys representing both the company and Dr. Rogers negotiated a settlement of the malpractice claim. The policy under which Dr. Rogers was insured provided that the written consent of a former insured was not required before the insurer made any settlement of any claim or suit "even if such claim or suit was made, preferred or alleged while such former insured was an insured under this policy." Dr. Rogers, however, stated that during the pendency of the malpractice action, he repeatedly informed one of the partners in the defending law firm that he would not consent to the settlement of the action, that he was assured that the action would be defended, and that at no time was he advised that his attorneys intended to settle the malpractice suit. Although the attorneys argued before the Illinois Supreme Court that they did not breach an independent duty owed to the insured and that because the insurer was authorized to settle the malpractice litigation without insured's consent, no conflict of interest arose between the parties to the insurance contract, the Court held:
Although defendants were employed by the insurer, plaintiff, as well as the insurer, was their client and was entitled to full disclosure of the intent to settle the litigation without his consent and contrary to his express instructions. Defendants' duty to make such disclosure stemmed from their attorney-client relationship with plaintiff and was not affected by the extent of the insurer's authority to settle without plaintiff's consent. (Citations omitted).
Rogers, 40 Ill.Dec. 816, 407 N.E.2d at 49.
While the doctor in Illinois told the defendants not to settle the case, that distinction from the present case is of no moment. Here, Dr. Teague was led to believe that his case would not be settled because the claim against him was very defendable. The issue of settling the case was never discussed. We find this a compelling factor in Dr. Teague's claim of legal malpractice.
In the present case, it is apparent defendants felt more loyalty to St. Paul than they did for Dr. Teague. If divided loyalties arise during dual representation of two or more clients, it must be disclosed in order to avoid injury to a client. Here, by failing to inform Dr. Teague of the loss of a jury trial, which in turn led to the mediation and settlement of his case, defendants deprived Dr. Teague of the opportunity of hiring independent counsel to defend him in the malpractice claim against him.[3] This clearly constitutes a claim for legal malpractice, subject to the peremptive limitations for filing a legal malpractice claim.
Having established that Dr. Teague's claim falls within legal malpractice, we turn now to the seminal issue in this case of whether knowledge of a bad result is sufficient to trigger the running of peremption in a legal malpractice action. La. Rev.Stat. § 9:5605 governs the peremption of legal malpractice claims and provides, in pertinent part:
A. No action for damages against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of *1274 this state to engage in the practice of law, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section are remedial and apply to all causes of action without regard to the date when the alleged act, omission, or neglect occurred. However, with respect to any alleged act, omission, or neglect occurring prior to September 7, 1990, actions must, in all events, be filed in a court of competent jurisdiction and proper venue on or before September 7, 1993, without regard to the date of discovery of the alleged act, omission, or neglect. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.
A straightforward reading of the statute clearly shows that the statute sets forth two peremptive limits within which to bring a legal malpractice action, namely one year from the date of the alleged act or one year from the date of discovery with a three-year limitation from the date of the alleged act, omission, or neglect to bring such claims. La.Rev.Stat. 9:5605; see also Reeder v. North, 97-0239, p. 6 (La.10/21/97), 701 So.2d 1291, 1295; Jennifer Thornton, Comment: Louisiana Revised Statute Section 9:5605: A Louisiana Lawyer's Best Friend, 74 Tul.L.Rev. 659, 661 (1999-2000). The latter period clearly carves out an equitable exception to the commencement of peremption that resembles the discovery exception of our jurisprudential doctrine of contra non valentem with an additional qualification that the statutory discovery exception is expressly made inapplicable after three years from the act, omission, or neglect. La.Rev.Stat. § 9:5605. The discovery rule, which our jurisprudence delineates as the fourth category of contra non valentem, is an equitable pronouncement that statutes of limitation do not begin to run against a person whose cause of action is not reasonably known or discoverable by him, even though his ignorance is not induced by the defendant. Hendrick v. ABC Ins. Co., 00-2403 (La.5/15/01), 787 So.2d 283(applying law predating the enactment of La.Rev.Stat. § 9:5605); Thornton, supra, at p. 666-67. Given the resemblance between the statutory discovery rule and our jurisprudential one, it logically follows that we interpret the statutory rule in accordance with the jurisprudential one, but within the statutory limitations.[4] *1275 Thus, under the provisions of La.Rev.Stat. § 9:5605, an action should not be found perempted if it is brought within one year of the date of discovery and the record shows that the claimant was reasonably unaware of malpractice prior to the date of discovery and the delay in filing suit was not due to willful, negligent, or unreasonable action of the client. See generally, Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502(interpreting the discovery rule as contained in the Louisiana Medical Malpractice Act); Bailey v. Khoury, 04-0620 (La.1/20/05), 891 So.2d 1268(interpreting the discovery rule as contained in the Louisiana Medical Malpractice Act). Although Dr. Teague's petition was filed more than one year after the date of malpractice, i.e., the failure to post the jury bond, the plaintiff asserts that he filed his petition within one year from the date of discovery and well within a period of three years from the date of the alleged act, omission, or neglect. The question, therefore, becomes whether the date of discovery alleged by Dr. Teague, as well as his actions following such discovery, were reasonable, with the burden placed squarely on the exceptor to prove otherwise and to establish the action perempted.
The "date of discovery" from which prescription or peremption begins to run is the date on which a reasonable man in the position of the plaintiff has, or should have, either actual or constructive knowledge of the damage, the delict, and the relationship between them sufficient to indicate to a reasonable person he is the victim of a tort and to state a cause of action against the defendant. See Bailey, 04-0620 at p. 9, 891 So.2d at 1275. Put more simply, the date of discovery is the date the negligence was discovered or should have been discovered by a reasonable person in the plaintiff's position. Thornton, supra. In Campo v. Correa, 01-2707, pp. 11-12 (La.6/21/02), 828 So.2d 502, 510-11, this Court explained the reasonableness of the date of discovery under the prescriptive provisions of the Louisiana Medical Malpractice Act:
Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Percy v. State, E.A. Conway Memorial Hosp., 478 So.2d 570 (La.App. 2 Cir.1985). A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. Ledet v. Miller, 459 So.2d 202 (La.App. 3 Cir.1984), writ denied, 463 So.2d 603 (La.1985); Bayonne v. Hartford Insurance Co., 353 So.2d 1051 (La.App. 2 Cir.1977); Opelousas General Hospital v. Guillory, 429 So.2d 550 (La.App. 3 Cir.1983). Nevertheless, a plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. Gunter v. Plauche, 439 So.2d *1276 437, 439 (La.1983). Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related. Griffin v. Kinberger, 507 So.2d 821 (La. 1987). The ultimate issue is the reasonableness of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct. See Griffin, 507 So.2d at 821.
Because the provisions on prescription governing computation of time apply to peremption, the principles applicable in the computation of time under the discovery rule in the medical malpractice provisions, although prescriptive in nature, nevertheless should apply to the computation of time under the discovery rule of the peremptive period for legal malpractice. See La. Civ.Code art. 3459 ("The provisions on prescription governing computation of time apply to peremption."). Accordingly, peremption commences to run in legal malpractice cases when a claimant knew or should have known of the existence of facts that would have enabled him to state a cause of action for legal malpractice. See generally, Campo, 01-2707 at p. 12, 828 So.2d at 511. Notwithstanding, a claimant's mere apprehension that something may be wrong is insufficient to commence the running of peremption unless the claimant knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. Id.; see also Gunter v. Plauche, 439 So.2d 437, 439 (La.1983). Therefore, even if the client is aware that an undesirable result has developed arising out of the representation, peremption will not run as long as it was reasonable for the plaintiff not to recognize that the result might be due to malpractice. See generally, Campo, 01-2707 at p. 12, 828 So.2d at 511; see also, Griffin v. Kinberger, 507 So.2d 821 (La.1987).
The underlying action of malpractice that precipitated the settlement, was the failure by Dr. Teague's attorneys to post the jury bond. This occurred in August 1999. Thus, the question for this Court is the appropriate date of discovery of the malpractice by Dr. Teague from which peremption commenced to run. The defendants argued and the court of appeal agreed that peremption ran from the date Dr. Teague learned of the settlement of the underlying medical malpractice case, October 29, 1999, as knowledge of the settlement was sufficient to excite attention and to put Dr. Teague on guard and call for inquiry. The plaintiff contrarily argues, with which the district court agreed, that while he did become aware on October 29, 1999, that the medical malpractice case against him had been mediated and settled, he was unaware of any acts of legal malpractice by defendants that precipitated the settlement. He argues the acts of malpractice were not reasonably discoverable until he retained new counsel, who obtained his file and disclosed to him the acts of legal malpractice committed by defendants. After careful review of the record, we find it was reasonable for Dr. Teague not to recognize what prompted the defendants to mediate and settle the medical malpractice claim.
At trial, Dr. Teague testified to his shock and confusion upon learning of the settlement of the underlying medical malpractice case. All previous correspondence with his attorney indicated the suit was defendable and was proceeding to trial by jury. The subsequent submission of the erroneous settlement specifics to the NPDB was especially unnerving. He then sought other legal counsel, primarily to *1277 contest the erroneous information submitted to the NPDB by St. Paul. He explained that
[i]n that process I had to have some legal counsel because I didn't know how to do that. We were able to change at least the data bank entry to operating without consent. So during this process, this took several months if I recall, I got all the documentation from Mr. Zuber's office on what went on, and the attorney who was helping me with this said there are some things in here that just don't look like your attorneys were doing what needed to be done for you to defend this case, and that's how we kind of grew to this day.
What Dr. Teague actually knew on October 29, 1999, was that an undesirable result had occurred, at least from his perspective, i.e., the settlement. He did not know about the lost opportunity for a jury trial and the corresponding failure to post the jury bond, because of the defendants' conscious decision not to inform him of such. Nothing at that time was apparent to Dr. Teague. Moreover, the record is void of any indicators which would have been apparent to a reasonable person on that date that the jury trial had been lost due to the failure by his attorneys to post a jury bond and that the loss of the jury served as the motivation for the mediation and settlement.
Because the actions of mediating and settling the case were not negligent acts in and of themselves, a fortiori, Dr. Teague should not be held to have reasonably known that legal malpractice had occurred and had precipitated the mediation and settlement. To the contrary, we find it was reasonable for Dr. Teague not to recognize that the undesirable result might be due in part to malpractice because his insurance policy did not contain a "consent to settle" clause. Both St. Paul and the defendants were well within their contractual rights in effecting the mediation and subsequent settlement without his consent, notwithstanding the blatant omission by the defendants in never informing him of the loss of the jury trial due to their own negligence in failing to post the jury bond, which prompted defendants' settlement of the case.
Furthermore, we find, at all times, Dr. Teague acted with due diligence and in an appropriate and reasonable manner. Shortly after learning of the bad result,[5] he retained new counsel. Significantly, it would have been imprudent for Dr. Teague to simply act out of passion and sue his lawyers based upon what he perceived as a bad result without first taking reasonable steps to investigate and discover the underlying facts and circumstances.
Sound policy reasons support such a conclusion. Knowledge of a bad result does not necessarily include knowledge of the cause or reason for the bad result. Although the bad result is part of the overall malpractice equation, most often the reason or cause of the bad result constitutes the actual act of malpractice. To hold that peremption commences from the date of knowledge of a bad result would precipitate lawsuits unnecessarily to preserve rights. An investigation might prove the absence of any malpractice or that the result was not caused by the defendant's negligence. Rather, we find it is the knowledge of the cause or reason for the undesirable result that commences the running of peremption when such knowledge is not self evident from the bad result. In the present case, an investigation was necessary for Dr. Teague to reasonably learn of the malpractice. Moreover, had Dr. Teague not taken exception to the *1278 submission of erroneous information to the NPDB and sought other counsel, the malpractice in this case may never have been discovered.
On October 29, 1999, Dr. Teague had neither actual nor constructive knowledge of the existence of any substandard legal practice and had no evidence to connect the adverse outcome, the settlement, with the acts of legal malpractice by his attorneys, because defendants never informed him of their failure to post the jury bond, a fact they knowingly withheld from him. Once those acts of malpractice were revealed to him by virtue of an investigation into the matter by another attorney, then he did promptly file a legal malpractice suit. Because the bad result was not self evident of the malpractice involved, we find peremption could not have begun to run until several weeks after October 29, 1999, when Dr. Teague first discovered the malpractice. Dr. Teague's petition was filed on November 3, 2000, and was thus timely pursuant to the provisions of La. Rev.Stat. § 9:5605. Accordingly, the judgment of the court of appeal is reversed, and this matter is remanded to the court of appeal for consideration of defendants' assignments of error on appeal.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and this matter is remanded to the court of appeal for consideration of defendants' assignments of error on appeal.
REVERSED AND REMANDED.
JOHNSON and VICTORY, JJ., dissent.
TRAYLOR, J., dissents and assigns reasons.
WEIMER, J., concurs with reasons.
TRAYLOR, Justice, dissenting.
While I agree with the majority's statements about the operation of peremption, I find such a discussion irrelevant in this case, and thus, dicta. St. Paul Insurance Company ("St. Paul"), Dr. Teague's malpractice insurer, assigned the defense of the medical malpractice suit to the law firm. There is no disagreement that Dr. Teague's policy with St. Paul did not contain a "consent to settle" clause, which means that the insurer did not have to obtain Dr. Teague's consent to any proposed compromise of a malpractice claim covered by the policy.[1]
Thus, whether the law firm properly filed a jury bond is without effect in this context. The law firm could have filed the jury bond timely and yet subsequently settled the medical malpractice law suit with the same consequences of which Dr. Teague complains in his legal malpractice suit. Due to the clear language of Dr. Teague's malpractice insurance policy with St. Paul, he is without authority to contest the compromise of his malpractice claim. Moreover, the damages which Dr. Teague claims in his legal malpractice suit stem solely from St. Paul's reporting of the settlement to the National Practitioner Data Bank, rather than the actions of the attorneys.[2]
The majority opinion implies that Dr. Teague had an arguable claim against his attorneys, when he clearly had none. Although the opinion correctly asserts the necessary elements of a legal malpractice claim, i.e. the existence of an attorney-client *1279 relationship, negligent representation by the attorney, and loss caused by that negligence, the majority finds only that an attorney-client relationship existed and that there was a negligent representation by the attorneys to their client, Dr. Teague. The opinion is silent as to how the loss or damages claimed by Dr. Teague were caused by the asserted negligent representation. It bears repeating that the loss and/or damages claimed stemmed solely from St. Paul's reporting of the settlement, rather than the actions or inactions of the attorneys in timely filing a jury bond.
While Dr. Teague may have grounds to file a bar complaint, he did not assert, and certainly did not prove, a claim in legal malpractice. Consequently, I believe this court should find, on its own motion, that Dr. Teague has neither a right of action (based on the language of the insurance contract) nor a cause of action (because there are no damages which can be attributable to the actions of the attorneys) against the law firm or the individual lawyers who were assigned to work on his medical malpractice case. See La. C.C.P. art. 927(B). To remand the matter to the court of appeal so that the appellate court may first act upon the attorneys' claims on appeal is a waste of judicial resources when the matter should be disposed of here.
Accordingly, I respectfully dissent.
WEIMER, J., concurring.
I concur in the result which determines that this matter is not perempted. All other issues previously raised in the court of appeal remain for resolution on remand.
NOTES
[1] St. Paul and its claims adjuster, Catherine Laufer, were also named as defendants, but were subsequently dismissed from the suit.
[2] The NPDB was established through Title IV of Public Law 99-660, the Healthcare Quality Improvement Act of 1986. Practitioner Data Bank Page. U.S. Department of Health and Human Services Health Resources and Services Administration. December 11, 2007 . The NPDB contains reports of paid medical malpractice judgments and settlements, among other actions, against physicians, dentists, and other health care practitioners. The law specifies that the NPDB make reported information available to hospitals, health care entities with formal peer review, professional societies with formal peer review, State licensing authorities, health care practitioners (self-query), researchers (statistics only), and in limited circumstances, plaintiffs' attorneys. Id. The NPDB is specifically prohibited from disclosing specific information on practitioners to the general public. Id. The intent of the NPDB is to improve the quality of health care by encouraging State licensing boards, hospitals, and other health care entities, and professional societies to identify and discipline those who engage in unprofessional behavior; and to restrict the ability of incompetent physicians, dentists, and other health care practitioners to move from State to State without disclosure or discovery of previous medical malpractice payment and adverse action history. National Practitioner Data Bank Page. National Practitioner Data Bank and Healthcare Integrity and Protection Data Bank. December 10, 2007 . The NPDB is primarily an alert or flagging system intended to facilitate a comprehensive review of health care practitioners' professional credentials. Id. The information contained in the NPDB is intended to direct discrete inquiry into, and scrutiny of, specific areas of a practitioner's licensure, professional society memberships, medical malpractice payment history, and record of clinical privileges. Id.
[3] We will not discuss the issue of Dr. Teague's damages as we granted this writ to address only the issue of peremption. We are remanding this case to the court of appeal to dispose of the defendants' assignments of error that were pretermitted by the court of appeal.
[4] Our jurisprudence provides that the doctrine of contra non valentem does not apply to peremption. Reeder, 97-0239 at p. 12, 701 So.2d at 1298. The Legislature, on the other hand, codified this discovery exception. La. Rev.Stat. § 9:5605. So although the doctrine of contra non valentem does not apply, we are bound to apply the exception provided by law as clearly and unambiguously written by the Legislature. La. Civ.Code art. 9; La.Rev.Stat. § 1:4. Notably, the discovery exception contained in La.Rev.Stat. § 9:5605 replicates the discovery exception contained in La.Rev.Stat. § 9:5628 of the Louisiana Medical Malpractice Act, which this Court has interpreted in accordance with our contra non jurisprudence. See Campo, 01-2707, p. 9 (La.6/21/02), 828 So.2d 502, 509. It logically follows, therefore, that we interpret the discovery exception at issue by analogy with our jurisprudence on the discovery rule in medical malpractice actions, but within the limitations provided by the Legislature in the relevant statutory provisions.
[5] The record does not show the exact date he retained new counsel.
[1] Majority Opinion, p. 1269.
[2] The majority opinion notes that St. Paul and its claims adjuster were initially named as defendants, but were subsequently dismissed from the suit. Majority Opinion, p. 1269, fn. 1.