ROSEMARY LEDET, Judge.
Lin this legal malpractice action, the plaintiff, Marco Tulio Miralda, appeals the trial court’s judgment granting the peremptory exception .of peremption filed by the defendants, Romauldo Gonzalez, Sr., and the Law Offices of Romauldo Gonzalez, L.L.C. d/b/a Braden Gonzalez and Associates (collectively “Mr. Gonzalez”). Because we find the trial court properly applied the one-year peremptive period set forth in La. R.S. 9:5605(A) and because we find the fraud exception set forth in La. R.S. 9:5605(E) is inapplicable, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On July 19, 2013, Mr. Miralda filed this legal malpractice suit against Mr. Gonzalez. In his petition, he alleged that he first retained Mr. Gonzalez in January 2008 for assistance in renegotiating a mortgage note held by Wells Fargo (the “Mortgage Note”) on his home located on Frenchman Street in New Orleans, Louisiana (the “Property”). At that time, he was significantly in arrears on the Mortgage Note. Although Wells Fargo (through its attorney, the law firm of Dean |2Morris, L.L.P. *1001 (“Dean Morris”)) already had filed a foreclosure proceeding,[1] Mr. Miralda alleged that Wells Fargo had agreed to negotiate regarding reinstatement of the loan. Mr. Miralda further alleged that he was advised by Jose Chacon — a non-attorney employee of Mr. Gonzalez’s firm — to deposit over $30,000 into Mr. Gonzalez’s trust account to be utilized as a down-payment toward renegotiation of the Mortgage Note. Mr. Miralda thus deposited $83,864.75 into the trust account (the “Deposit”). According to Mr. Miralda, the Deposit effectively equaled his savings. Mr. Miralda alleged that he requested Mr. Gonzalez to “do everything possible to protect the [Property.”
Thereafter, Mr. Miralda met with Mr. Chacon a number of times to issue payments to Wells Fargo and to sign paperwork, which Mr. Miralda understood was being submitted to Wells Fargo. Mr. Mir-alda alleged that, for reasons not explained to him, Mr. Gonzalez’s office was “never available to finalize the negotiation with Wells Fargo.” Mr. Miralda further alleged that on September 9, 2009, Dean Morris sent correspondence to Mr. Cha-con, in response to a previous offer by Mr. Gonzalez’s firm, proposing a lump-sum payment of $20,000 to cease the foreclosure process. Mr. Miralda alleged that “[t]his letter advised [MR.] CHACON that such an offer would need to be forwarded to Wells Fargo directly stating that if DEFENDANTS, on [MR.] MIRALDA’s behalf had $20,000 available to put toward the arrearage to contact Loss Mitigation to finalize the |,^arrangement.” Mr. Miralda alleged that despite the fact he had over $20,000 remaining of the Deposit, no offer was ever sent to Wells Fargo.
Beginning in March 2009, Mr. Miralda acknowledged that he made several withdrawals from the Deposit. Mr. Miralda, however, alleged that he was neither advised against making the withdrawals nor informed that doing so would have a detrimental effect on Mr. Gonzalez’s negotiations on his behalf. Instead, he alleged that these withdrawals always were allowed and unquestioned.
In late September or October 2010, Mr. Miralda alleged that he learned that he was evicted from his home. Following his eviction, Mr. Miralda visited Mr. Gonzalez’s office eleven times; however, he “was never informed that the case had been finalized,” that he had no further recourse, or that there were “any steps he may take in order to challenge the eviction.”
On June 30, 2011, Mr. Miralda alleged that he was informed that Mr. Gonzalez’s firm was no longer representing him in this matter and that Mr. Gonzalez was charging him over $6,800 for “legal fees.” Mr. Miralda alleged that he never met with Mr. Gonzalez or any other attorney in Mr. Gonzalez’s firm. He further alleged that he was never given an accounting of the time spent by Mr. Gonzalez’s firm on the matter or advised of the amount of attorney’s fees charged on the matter. He still further alleged that no contract was ever executed between him and Mr. Gonzalez’s firm related to this matter.
Finally, Mr. Miralda alleged that he was unaware of the nature or extent of Mr. Gonzalez’s malpractice until “visiting separate counsel” and “reviewing Ucorrespondence from DEFENDANTS concerning the representation of [MR.] MIRALDA.” He contends he was “only finally able to meet with his attorneys to *1002 discuss this matter on or about November 16, 2012, at which time he first became aware that he had no recourse related to the [P]roperty, as well as the facts ... concerning DEFENDANTS failure to negotiate on his behalf, lack of attorney representation and unauthorized billing.”
Based on the above facts, Mr. Miralda asserted in his petition roughly six malpractice claims.[2] He also asserted an “intentional fraud” claim. In response, Mr. Gonzalez filed a peremptory exception of peremption. He contended that all the alleged acts of malpractice occurred over one year before the suit was filed on July 19, 2018, and that Mr. Miralda’s claims were thus barred by peremption under La. R.S. 9:5605(A). He further contended that the fraud exception under La. R.S. 9:5605(E) was inapplicable.
In April 2014, a two-day evidentiary hearing was held on the peremptory exception. At the hearing, four witnesses testified — Mr. Miralda, Mr. Gonzalez, Mr. Chacon, and Lourdes Letona — and documentary evidence was introduced. Briefly, the four witnesses provided the following background information.
LMr. Gonzalez testified that he had been practicing law for over forty years. He identified the two members of his firm who were involved in handling Mr. Miralda’s case as follows: (i) his legal assistant, Mr. Chacon; and (ii) his office manager, Ms. Letona.
Mr. Chacon testified that he was a former banker and a licensed mortgage broker and that he had extensive experience handling difficult credit-related matters. In general, he assisted in handling the firm’s foreclosure and bankruptcy matters. In this case, he assisted in preparing the loan workout with Wells Fargo, communicated with potential new lenders, and assisted Mr. Miralda in preparing the loan packages.
Ms. Letona, albeit not an accountant, testified that she handled the firm’s banking and bookkeeping. She communicated with Mr. Miralda regarding his repeated requests to withdraw funds from the Deposit, and she prepared a ledger of those withdrawals.
Mr. Miralda testified that he had lived in the United States for the last forty years. He attended six years of school and two years of college in his country, Honduras. Mr. Miralda testified that between January 2008 and June 2011 he was not steadily employed; instead, he was collecting unemployment.
Based on the testimony and documentary evidence presented at the hearing, the following time line of events was established.
On October 29, 1999, Mr. Miralda and his unmarried sister, Maria Miralda, purchased the Property. They financed the purchase by executing the Mortgage Note — a promissory note for $77,862.00 that was secured by a mortgage encumbering the Property. On September 1, 2001, Maria Miralda died. In 2004, her *1003 succession was opened; and a judgment of possession was obtained. Because |fishe was not married and never had any children, each of her five surviving siblings— Mr. Miralda and his four other sisters— inherited a one-fifth interest in her one-half interest in the Property. Until March 2005, Mr. Miralda paid the Mortgage Note and resided in the house located on the Property. Beginning in March 2005, he discontinued paying the Mortgage Note. Meanwhile, in August 2005, the house on the Property sustained severe damage as a result of Hurricane Katrina.[3]
On March 19, 2007, the holder of the Mortgage Note, Wells Fargo, commenced a foreclosure proceeding by filing a “Petition to Enforce Security Interest by Exec-utory Process.” In its petition, Wells Fargo named the following defendants: (i) Mr. Miralda, as the maker of the Mortgage Note; and (ii) Mr. Miralda’s four siblings (sisters), as co-owners of the Property. Wells Fargo alleged that Mr. Miralda defaulted on the Mortgage Note by failing to pay the April 1, 2005 monthly installment and all successive monthly installments.
On September 1, 2007, Mr. Miralda first presented to Mr. Gonzalez; and a new client case file was opened for him.[4] At the initial visit, Mr. Miralda informed Mr. Gonzalez that he wanted to take his two sisters who lived in Honduras off the title to the Property. Simply stated, he wanted to be the sole owner of the Property. Based on what Mr. Miralda represented,[5] Mr. Gonzalez’s plan was to open a | succession and to have Mr. Miralda’s two sisters renounce their interest in the succession. To prepare the necessary paperwork to complete the succession, Mr. Gonzalez needed a copy of the legal description of the Property. When Mr. Gonzalez sent Mr. Chacon to City Hall to obtain one, he discovered that in 2004 Maria Miralda’s succession had been completed and that a judgment of possession had been rendered.[6] He also discovered that Mr. Mir-alda had failed to inform him that he had two other — a total of four — surviving sisters, each of whom had an interest in the Property.
On January 9, 2008,[7] Mr. Miralda called Mr. Gonzalez’s office and reported that he had an emergency. His emergency was that he had been served with a bunch of papers regarding the foreclosure of the Property. At that point, Mr: Gonzalez first learned of the pending executory proceeding and that a judicial sale of the Property was scheduled.[8] Given the na *1004 ture of Mr. Miralda’s problem, Mr. Gonzalez brought in Mr. Chacon to meet with Mr. Miralda and to work on his case.
Although filing for bankruptcy was an option considered for Mr. Miralda, the firm ruled this option out for multiple reasons, including Mr. Miralda’s lack of steady employment. Instead, the firm’s plan was to postpone the judicial sale and |sto negotiate with Wells Fargo to have Mr. Miralda’s mortgage loan reinstated. To facilitate the plan, Mr. Chacon instructed Mr. Miralda to bring any paperwork that he received to the firm. He also instructed Mr. Miralda to deposit about $34,000 in a trust account with the firm— $30,000 was earmarked for negotiating with Wells Fargo to reinstate or modify the loan,[9] and $4,000 was earmarked as a retainer for the firm’s legal services.
On January 9, 2008, the Gonzalez firm faxed correspondence to Wells Fargo’s attorney, Dean Morris, informing that the firm was representing Mr. Miralda with regard to renegotiating the loan. On January 17, and January 25, 2008, Mr. Miralda executed powers of attorney authorizing Mr. Gonzalez and Mr. Chacon, respectively, to act on his behalf in connection with the Wells Fargo loan.
On January 16, 2008, Wells Fargo sent Mr. Miralda a payoff statement (good through January 31, 2008), demanding payment of $102,764.34 in certified funds payable to Dean Morris, to stop the foreclosure.
On February 24, 2008, the Gonzalez firm made an offer to Wells Fargo, on Mr. Miralda’s behalf, to buy the Property under a “short sale” for $75,000.[10] Wells Fargo rejected the offer.
On April 24, 2008, Mr. Miralda presented a cashier’s check in the amount of $33,864.75, made payable to Braden Gonzalez and Associates — the Deposit. Mr. Gonzalez’s office manager, Ms. Letona, acknowledged that she deposited Mr. LMiralda’s check into the firm’s operating — not its trust — account. She explained that she did so because she understood the transaction would be a flow through; shortly after the Deposit was received, she understood that she would be requested to obtain a cashier’s check for a similar amount.
On July 16, 2008, Mr. Chacon wrote to Dean Morris and offered $30,000 plus monthly payments due for May, June, July, and August 2008 to stop any further legal proceedings. On August 4, 2008, Dean Morris confirmed receipt of the offer. On August 19, 2008, Dean Morris followed-up and instructed Mr. Chacon to deal directly with Wells Fargo’s Loss Mitigation Department (“Loss Mitigation”) to discuss alternative resolutions.
On March 10, 2009, Mr. Chacon forwarded to Wells Fargo a Loan Modification Application, which included Mr. Mir-alda’s financial, employment, and income information.
On May 19, 2009, Mr. Chacon sent a letter to Wells Fargo, which was accompa *1005 nied by Mr. Miralda’s Letter of Hardship, Proof of Income, Personal Financial Statement, and a check for $25,000 (a lump sum offer). On May 22, 2009, Wells Fargo replied, returning the check and stating that it could not apply the funds as requested.
On July 30, 2009, Mr. Chacon wrote Dean Morris complaining that they were “getting the run around” on Mr. Miralda’s case. He explained that Mr. Miralda had received a payment coupon calling for two payments, including one for $1,114.82, and that those payments had been made but returned to him.[11] In this |1flletter, Mr. Chacon stated that “at this time [Mr. Mir-alda] is prepared to offer a $20,000 lump sum payment to resolve the foreclosure process.” On August 24, 2009, Dean Morris wrote Mr. Chacon advising that it had forwarded his correspondence regarding this matter to Wells Fargo for review and that the foreclosure had been placed on hold so that it could respond to the dispute.
On September 5, 2009, Dean Morris wrote Mr. Chacon and apologized for the present situation; nonetheless, Dean Morris informed him that it lacked the authority to do any type of workout plan. Dean Morris instructed Mr. Chacon to contact the Loss Mitigation Department directly regarding a workout plan. Dean Morris also pointed out that Mr. Miralda was $30,000 to $40,000 in arrears and had a negative escrow balance. Dean Morris noted in its letter that “[i]f you have $20,000 available to put towards the ar-rearage (certified funds only) contact Loss Mitigation and advise them of this and I feel they will be more inclined to work out a deal with you.” Dean Morris also warned that it had been instructed by its client, Wells Fargo, to continue proceeding with the foreclosure. According to Mr. Chacon, the firm did not offer $20,000 to Wells Fargo at that juncture because the firm had already offered Wells Fargo a much higher amount. Mr. Chacon also testified that the September 9, 2009 letter said “if you offer they might consider or something along those lines.”
On October 9, 2009, Mr. Chacon, on Mr. Miralda’s behalf, submitted another loan modification proposal to Wells Fargo. This proposal included a Letter |nof Hardship, Proof of Income, and a tender of partial payment of arrearages in the amount of $15,000. According to Mr. Cha-con, the amount tendered was “closer to what was available” — the remaining funds from the Deposit.[12]
On November 3, 2009, Wells Fargo notified Mr. Miralda of its final decision on his mortgage loan request. It informed Mr. *1006 Miralda that it would not renegotiate the terms of his mortgage.
On November 17, 2009, Wells Fargo notified Mr. Miralda and his four sisters of the pending acquisition of the Property. The notice of the pending foreclosure, which was sent by certified mail, was in Spanish. On December 29, 2009, Wells Fargo purchased the Property at a sheriffs sale. In March 2010, Wells Fargo secured a judgment for the balance owed. On June 28, 2010, a Notice to Vacate was issued, which was posted at the premises.
On July 9, 2010, Dean Morris responded to Mr. Chacon’s request for instructions for purchasing the Property from Wells Fargo; it stated that the purchase price was $122,125.
According to Mr. Gonzalez, after the Property was sold at the sherifPs sale to Wells Fargo, Mr. Miralda was informed that the only feasible alternative was to find a secondary lender who would be willing to lend him the purchase price demanded by Wells Fargo to buy his house back. Mr. Gonzalez explained that the firm shifted its “efforts from trying to convince Wells Fargo of the creditworthiness of Mr. Miralda to trying to get a local lender to join in and approve a mortgage loan application.” Mr. Gonzalez further explained that he | ^attempted to obtain a loan for Mr. Miralda through his friend, E.W. King with Coastal Mortgage. Coastal Mortgage, however, refused to extend a loan to Mr. Miralda due to his dismal credit rating and lack of steady income.
In dealing with Coastal Mortgage, Mr. Gonzalez explained that the firm discovered Mr. Miralda had a sister, Rosa Velasquez, who had steady employment and a banking relationship with Regions Bank. Ms. Velasquez was also a co-owner of the Property. In August 2010, the Gonzalez firm contacted Regions Bank regarding a possible joint loan application by Mr. Mir-alda and Ms. Velasquez. Also in August 2010, Mr. Gonzalez testified that he met with Mr. Miralda and Ms. Velasquez in his office regarding the joint loan application.[13] At that meeting, he informed Mr. Miralda that if Ms. Velasquez refused to co-sign for the loan, he could not help him any further. Although Ms. Velasquez completed the loan application, it was never submitted because she ultimately refused to cosign for the loan. Nonetheless, Mr. Gonzalez testified that he did not immediately close the file for two reasons. First, Mr. Chacon had been told that there might be some changes in the banking regulations and that there might be an opportunity to buy back the Property. Second, Mr. King of Coastal Mortgage confirmed that he would reconsider Mr. Miralda for a loan if Mr. Miralda’s financial situation improved or he obtained steady employment.
On October 22, 2010, Mr. Miralda was evicted from the Property.
On June 30, 2011, Mr. Chacon and Ms. Latona, at Mr. Gonzalez’s request, met with Mr. Miralda to close the file. It is undisputed that Mr. Gonzalez did not attend the final meeting. According to Mr. Gonzalez, a few days before the | ^meeting, he instructed Ms. Latona that the firm could no longer function as Mr. Miralda’s “ATM machine”; and he requested that she do a final accounting. Between March 2009 and June 2011, the firm, at Mr. Miral-da’s request, issued eighteen checks to him from the Deposit. Mr. Miralda’s withdrawals totaled $27,020.21. At the June 80, 2011 meeting, Mr. Miralda was given a final check for $1,025.21 and informed that the remaining balance of the Deposit— $6,844.54 — would be retained for the legal services the firm' had provided to him. *1007 Ms. Letona and Mr. Chacon both testified that they reviewed with Mr. Miralda the final accounting of the Deposit (a ledger of his withdrawals),[14] answered all Mr. Miral-da’s questions, and informed him that the firm would no longer be handling his case.
Mr. Miralda similarly testified that his last meeting with Mr. Chacon was in the summer of 2011. He acknowledged that, at that meeting, he was given his last check and told that he was being charged between $4,000 and $6,000 for the work the firm performed; however, he testified that no one explained to him how the amount he was charged was calculated. He further testified that he never met with Mr. Gonzalez and that he believed Mr. Chacon was his attorney. Although he admitted that he had no trouble communicating with Mr. Chacon (who was from the same country as him),[15] Mr. Miralda testified that Mr. Chacon “never explain[ed] anything to [him].” According to Mr. Mir-alda, Mr. Chacon only told him to sign papers and that his case was “rolling” or “walking.”
[ ^Thereafter, Mr. Miralda consulted a new attorney, Caesar Burgos. On May 10, 2012, Mr. Burgos wrote to Mr. Gonzalez stating as follows:
Please note that we have been retained to represent Mr. Marco Tulio Miranda [sic]. It is our understanding that you previously assisted Mr. Miranda [sic] in matters related to a Wells Fargo mortgage and that certain funds were deposited into a trust account with your firm. Mr. Miranda [sic] has also indicated that he communicated with someone from your office named Jose Chacon. Please forward to our office within 5 days, an accounting of Mr. Miranda’s [sic] funds, which were deposited into your trust account as well as a copy of his complete file.
Mr. Gonzalez testified that this letter was the first time the firm heard from Mr. Miralda since the June 30, 2011 meeting. Mr. Gonzalez further testified that he requested Mr. Miralda’s authorization before responding to the May 10th request.
On June 4, 2012, Mr. Gonzalez received Mr. Miralda’s authorization to provide the requested information to Mr. Burgos. On June 8, 2012, Mr. Gonzalez replied, in writing, to Mr. Burgos’ May 10th request. Thereafter, Mr. Burgos made another request for information. Mr. Gonzalez responded in writing to that request on July 24, 2012.
On July 19, 2013, Mr. Miralda filed this legal malpractice suit against Mr. Gonzalez. As noted, Mr. Gonzalez replied by filing a peremption exception. Following the two-day evidentiary hearing, the trial court, on May 20, 2014, rendered judgment in Mr. Gonzalez’s favor, granting the exception and dismissing Mr. Miralda’s claims with prejudice. The judgment also provided for “each party to bear their costs.” This appeal by Mr. Miralda followed. Mr. Gonzalez answered the appeal seeking costs and frivolous appeal damages.
DISCUSSION
The timeliness of a legal malpractice claim is measured by La. R.S. 9:5605. Hodges v. Reasonover, 12-0043, p. 3 (La.7/2/12), 103 So.3d 1069, 1080-81 (Weimer, J., concurring), cert. de *1008 nied, — U.S. - 133 S.Ct. 1494, 185 L.Ed.2d 548 (2013). “This measure of timeliness is a peremptive — not prescriptive — period of time.” Id. (citing La. R.S. 9:5605(B)). Section B of the statute provides that “[t]he one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.” La. R.S. 9:5605(B).[16]
Three other sections of La. R.S. 9:5605 are pertinent to this case. First, Section A of the statute provides the one-year and the three-year peremptive periods; it reads as follows:
No action for damages against any attorney at law duly admitted to practice in this state ... whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
La. R.S. 9:5605(A).
Second, Section D of the statute provides that it applies to everyone; it reads as follows: “[t]he provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.” La. R.S. 9:5605(D).
|1f,Third, Section E of the statute sets forth a statutory exception for fraud;[17] it reads as follows: “[t]he peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.” La. R.S. 9:5605(E).
“The statute itself is clear and unambiguous, and our jurisprudence interpreting this statute is well-settled.” Smart v. Vazquez, 12-1694, p. 7 (La.App. 4 Cir. 6/12/13), 119 So.3d 901, 905, writ denied, 13-1661 (La.11/8/13), 125 So.3d 452. Under the statute, “[a]n action for legal malpractice must be brought within one year of the date of the act, omission, or neglect or within one year of the date of discovering the act, omission or neglect. In all events, a claim must be filed within three *1009 years of the date of the act, omission or neglect, regardless of when the act, omission or neglect is discovered.” Id. (citing Jenkins v. Starns, 11-1170, p. 13 (La.1/24/12), 85 So.3d 612, 620). Moreover, the Louisiana Supreme Court has recognized the clear legislative intent of this statute and its “perceived inequities.” Vazquez, 12-1694 at p. 7, 119 So.3d at 905 (citing Reeder v. North, 97-0239, p. 9 (La.10/21/97), 701 So.2d 1291, 1295, and Jenkins, supra).
|17The party raising an exception of peremption normally bears the burden of proof at trial of the exception. Schonekas, Winsberg, Evans & McGoey, L.L.C. v. Cashman, 11-449, p. 6 (La.App. 5 Cir. 12/28/11), 83 So.3d 154, 158 (citing McKinley v. Scott, 44,414, p. 4 (La.App. 2 Cir. 7/15/09), 17 So.3d 81, 83). When, however, the plaintiffs petition is perempted on its face, the burden shifts to the plaintiff to show otherwise. Dauterive Contractors, Inc. v. Landry and Watkins, 01-1112, p. 15 (La.App. 3 Cir. 3/13/02), 811 So.2d 1242, 1253; Lomont v. Myer-Bennett, 14-351 (La.App. 5 Cir. 10/29/14), — So.3d -, 2014 WL 5463316. “In applying this standard, the law requires that we strictly construe the statutes against prescription and in favor of the claim that is said to be extinguished.” Rondeno v. Yun-How Lee, 14-0063, p. 4 (La.App. 4 Cir. 6/25/14), 143 So.3d 1285, 1288, writ denied, 14-1577 (La.10/24/14), 151 So.3d 609 (citing cases).
The proper procedural mechanism to raise an exception of peremption under La. R.S. 9:5605 is a peremptory exception. See La. C.C.P. art. 927 A(2).[18] At a hearing on a peremptory exception pleaded before trial of the case, “evidence may be introduced to support or contro■vert any of the objections pleaded, when the grounds thereof do not appear from the petition.” La. C.C.P. art. 931. “When prescription is raised by peremptory exception, with evidence being introduced at the hearing on the exception, the trial court’s findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review.” Specialized Loan Servicing, LLC v. January, 12-2668, pp. 3-4 (La.6/28/13), 119 So.3d 582, 584 (citing London Towne Condominium Homeowner’s Ass’n v. London 1 Towne Co., 06-401, p. 4 (La.10/17/06), 939 So.2d 1227, 1231); see also Williams v. CDY Dev. Corp., 48,359, p. 8 (La.App. 2 Cir. 8/7/13), 124 So.3d 1, 6, writ denied, 13-2489 (La.1/17/14), 130 So.3d 947 (noting that the trial of a peremption exception is an evidentiary proceeding and that the trial court’s factual findings following such a trial are subject to a manifest error review). Under the manifest error standard, “[i]f the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed evidence differently.” Richard v. Richard, 11-0229, p. 4 (La.10/25/11), 74 So.3d 1156, 1158 (citing Stobart v. State Through Dep’t of Transp. and Development, 617 So.2d 880 (La.1993)).
In this case, there is no one “act, omission, or neglect” alleged to constitute malpractice; rather, as noted earlier, Mr. Mir-alda alleges in his petition roughly six malpractice claims. Moreover, the allegations of the petition, contrary to Mr. Gonzalez’s contention, do not establish that Mr. Miralda’s claims are barred by per-emption. Apparently anticipating a per- *1010 emption exception, Mr. Miralda alleges that he did not discover the malpractice until November 16, 2012, which is less than one year before the suit was filed on July .19, 2013. In an apparent attempt to invoke the fraud exception under La. R.S. 9:5605(E), he also alleges fraud in his petition. We thus find that the burden was on Mr. Gonzalez to establish that Mr. Miral-da’s claims were barred by peremption.
Mr. Gonzalez contends that Mr. Miralda was aware of all of the necessary facts constituting each of his alleged malpractice claims before either June 2011 — when his representation of Mr. Miralda ended — or May 2012 — when Mr. Miralda consulted a new attorney. Mr. Gonzalez thus contends that Mr. Miralda’s suit — [which 19 was not filed until July 2013 — was barred by per-emption under the one-year peremptive period set forth in La. R.S. 9:5605(A). Agreeing with Mr. Gonzalez, the trial court sustained his exception of peremption.
On appeal, Mr. Miralda assigns as error the trial court’s finding that he had actual or constructive knowledge of the alleged malpractice in either June 2011 — when he had his final meeting at Mr. Gonzalez’s office — or May 2012 — when he initially met with his new attorney to understand why he had lost his house. Mr. Miralda eon-trarily contends that because he never met with Mr. Gonzalez, he had no way of knowing about Mr. Gonzalez’s malpractice claims until he not only met with his new attorney, but also his new attorney communicated to him what had occurred. Mr. Miralda also contends that being disappointed with an attorney’s work product is not equivalent to being informed of the attorney’s malpractice. In support, Mr. Miralda cites Wong v. Hoffman, 05-1483 (La.App. 4 Cir. 11/7/07), 973 So.2d 4, for the principle that the peremptive period began to run “after [the plaintiff] consulted another attorney and discovered that [the plaintiff’s] previous attorney’s advice to her ... constituted potential malpractice.” Wong, 05-1483 at p. 10, 973 So.2d at 10. Based on this principle, Mr. Miralda contends that the proper date of discovery in this case is July 24, 2012 — when he first was advised by his new attorney of the potential legal malpractice and fraud committed by Mr. Gonzalez.[19]
In addressing the issues presented by Mr. Miralda’s appeal, we divide our analysis into two parts: the one-year peremp-tive period from the date of discovery and the fraud exception.
1 zgThe one-year peremptive period from the date of discovery
Because the statutory discovery rule for commencement of the. one-year peremptive period set forth in La. R.S. 9:5605(A) resembles the discovery rule embodied in the jurisprudential contra non valentem doctrine, the Louisiana Supreme Court recognized that interpretation of the statutory discovery rule should proceed in accordance with the jurisprudential doctrine. Teague v. St. Paul Fire and Marine Ins. Co., 07-1384, p. 12 (La.2/1/08), 974 So.2d 1266, 1274. For this reason, the Supreme Court held that the date of discovery is determined as follows:
The “date of discovery” from which prescription or peremption begins to run is the date on which a reasonable man in the position of the plaintiff has, or should have, either actual or constructive knowledge of the damage, the delict, and the relationship between them sufficient to indicate to a reasonable person he is the victim of a tort and to state a *1011 cause of action against the defendant. ... Put more simply, the date of discovery is the date the negligence was discovered or should have been discovered by a reasonable person in the plaintiff’s position.
Teague, 07-1384 at p. 13, 974 So.2d at 1275. Continuing, the Supreme Court cited Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502, and noted that the same principles that apply to the calculation of time in a medical malpractice case, despite being prescriptive in nature, apply to calculation of the peremptive period in a legal malpractice action. Teague, 07-1384 at p. 14, 974 So.2d at 1276.
More recently, the Supreme Court in Jenkins v. Starns, 11-1170 (La.1/24/12), 85 So.3d 612, summarized its holding in Teag-ue as follows:
Applying Campo to a legal malpractice claim, the [Teague ] Court held per-emption commences to run in a legal malpractice case when a claimant knew or should have known of the existence of facts that would have enabled him to state a cause of action for legal malpractice. A claimant’s mere apprehension something may be wrong is insufficient to commence the running of peremption unless the claimant knew or should have known through the exercise of reasonable diligence his problem may have been caused by acts of malpractice. The Court further held even if the client is aware an |¾1 undesirable result has developed arising out of the representation, peremption will not run as long as it was reasonable for the plaintiff not to recognize the result might be due to malpractice. 07-1384 at 14, 974 So.2d at 1276.
Jenkins, 2011-1170 at p. 15, 85 So.3d at 620-21.
The jurisprudence has held that the one-year peremptive period under La. R.S. 9:5605(A) commences when “a client knows or should have known that a lawyer’s actions or inactions may cause the client to incur damages, thereby creating a legal cause of action.” Atlas Iron and Metal Co. v. Ashy, 05-458, p. 5 (La.App. 3 Cir. 1/4/06), 918 So.2d 1205, 1210. “[T]he determination as to when the client’s cause of action arose must be made on a case-by-case basis.” Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P. v. Homestead Ins. Co., 97-0710, p. 4 (La.App. 4 Cir. 9/10/97), 700 So.2d 233, 235. In making the case-by-case determination, the jurisprudence has noted that the focus is on the appropriateness of the plaintiffs actions or inactions. Ledbetter v. Wheeler, 31,357, p. 5 (La.App. 2 Cir. 12/9/98), 722 So.2d 382, 385; Carroll v. Wolfe, 98-1910, p. 6 (La.App. 1 Cir. 9/24/99), 754 So.2d 1038, 1041.
The jurisprudence has identified three factors to be evaluated in determining whether a plaintiffs actions or inac-tions were reasonable. The first factor is the plaintiffs statements reflecting his dissatisfaction with, or suspicions of, the attorney’s actions, and whether the plaintiff investigated his accusations or suspicions. See Turnbull v. Thensted, 99-0025, p. 9 (La.App. 4 Cir. 3/1/00), 757 So.2d 145, 151 (finding that the plaintiff “inexcusably allowed 15 months to elapse before she filed her Original malpractice suit ... after verbally expressing her disapproval of [her attorney’s] work product.”). The second factor is the plaintiffs hiring of another attorney. See Turnbull, 99-0025 at p. 9, 757 So.2d at 150 (noting 122that “hiring an attorney is evidence of the awareness of a potential legal malpractice claim”). The third factor is the issuance of an adverse judicial ruling. See Perez v. Trahant, 00-2372 (La.App. 1 Cir. 12/28/01), 806 So.2d 110, 118 (finding a jury’s return of a verdict failing to award any damages was sufficient to excite a reasonable person’s *1012 attention that the alleged malpractice— fading to recommend a settlement — had occurred). In this case, the trial court, in its reasons for judgment, identified and addressed all three of these factors.
First, noting Mr. Miralda’s awareness of the adverse judicial ruling relative to his property, the trial court stated:
• Through their efforts, Mr. Gonzalez and Mr. Chacon were able to postpone the foreclosure sale five times[.] ... However, they were not successful in preventing the final foreclosure sale on March 4, 2010, and so [Mr.] Miralda ultimately lost his house.
• Mr. Miralda testified [that he lost his house in 2010 around Halloween].
Second, noting Mr. Miralda’s expression of his suspicion and dissatisfaction with Mr. Gonzalez’s firm, the trial court stated:
• Mr. Miralda admitted he had doubts about whether Mr. Gonzalez’s firm could do any more to help him when he came to the firm with his sister in August 2010 to discuss co-signing a loan to buy back his house from Wells Fargo after the foreclosure sale.
• Mr. Miralda testified that he was unhappy with Defendant’s handling of his legal matters when he met with Mr. Chacon and Ms. Letona “around the summer of 2011.” And was told the representation was over. He also learned at that time that he was being charged an additional $3,000 fee when he felt Defendant had “done nothing,” to help him keep his house, the reason for consulting him in the first place.
• By June 30, 2011, the date of his last visit to the firm when he was issued a check for the balance of his funds, given an accounting of his funds and charged an additional fee, Mr. Miralda was sufficiently unhappy about his representation to make further inquiries.
| ?c,Third, noting Mr. Miralda’s concerns about his dissatisfaction with Mr. Gonzalez’s firm prompted him to seek another attorney, the trial court stated:
• By [June 30, 2011], Mr. Miralda had all the information in hand that he needed to broach his concerns about his representation to a friend who recommended that he go see Mr. Burgos. Mr. Miralda’s testimony left no doubt he had enough concerns about Defendant’s handling of his legal matter by then to consult another attorney.
• Despite this knowledge, Mr. Miralda did not act on his knowledge and concerns right away, but waited almost a year before he consulted Mr. Burgos to inquire about his case in May of 2012.
The trial court’s analysis of these three factors supports its finding that Mr. Miral-da was aware of the events underlying his malpractice claims more than one year before filing suit. The trial court thus found Mr. Miralda’s suit barred by per-emption under the one-year peremptive period. Summarizing its reasons for sustaining the exception, the trial court stated:
Plainly, this case is pre-empted. Mr. Miralda knew that he was evicted from his home around Halloween of 2010, yet he didn’t consult another attorney then. Nor did he consult an attorney immediately after June 30, 2011, the date of the last act of malpractice alleged in his Petition. That is the date that his file was returned to him, he was charged an additional fee, and he learned that Mr. Gonzalez was no longer representing him. Clearly, he knew at that point of any potential problem. Instead he waited almost a year, until May 2012, to consult with new counsel and over a year from that date to file suit on July *1013 19, 2018.... Any reasonable person should have known there was a problem by Halloween 2010 at the earliest or at least when the file was returned to him in June of 2011.
On appeal, Mr. Miralda relies on the Wong case in support of his position that he could not have known of his malpractice claims until he consulted with a new attorney and was informed by that attorney of the malpractice claims. The Wong case, however, is distinguishable from this case, factually and legally.[20] | ^Factually, Mr. Miralda, unlike Ms. Wong, did not consult a new attorney immediately after he became dissatisfied with Mr. Gonzalez’s representation. Instead, Mr. Miralda waited almost a year after the June 30, 2011 final meeting before consulting a new attorney in May 2012. He then waited more than a year after that consultation to file suit. Legally, as Mr. Gonzalez points out, the nature of the alleged acts of malpractice in this case, unlike in Wong, is such that a [^reasonable person would have had sufficient notice to Call for inquiry. Mr. Miral-da’s reliance on Wong is thus misplaced.-
*1014 Mr. Miralda additionally contends that even assuming he knew or should have known of his malpractice claims by June 30, 2011 — when he had his final meeting with the Gonzalez firm — his claim was timely filed within the three-year per-emptive period — before June 30, 2014. This argument is unpersuasive. The three-year peremptive period is simply a cap on the one-year discovery period. As we explained in Brumfield v. McElwee, 07-0548, p. 5 (La.App. 4 Cir. 1/16/08), 976 So.2d 234, 239, “the latest one can file a legal malpractice action is three years from the date of the alleged act of malpractice, or one year from the date of discovery of the alleged act of malpractice, whichever comes first.” Id. (emphasis supplied). In this case, the discovery of the alleged malpractice claims came first.
We further note, as the trial court pointed out, that “it is what Mr. Miralda knew or should have known that is considered when deciding an Exception of Per-emption. It is not when Mr. Burgos, his attorney, discovered the alleged acts of malpractice.” Indeed, “[t]he law does not require that a plaintiff be informed of possible malpractice by an attorney ... before prescription begins to run.” Davidson v. Glenwood Resolution Auth., Inc., 47,640, p. 11 (La.App. 2 Cir. 1/23/13), 108 So.3d 345, 352 (citing Heirs of Jackson v. O’Donovan, 44,314 (La.App. 2 Cir.5/13/09), 12 So.3d 435); see also Smith v. Boothe, 28,065, p. 4 (La.App, 2 Cir. 2/28/96), 669 So.2d 682, 685 (noting that “a layman may not escape commencement of prescription by asserting that his ability to comprehend and evaluate the facts is limited” and that “[t]his is true despite appellant’s [sic] contention that, as non-lawyers, they could not know their attorney had committed ¡⅞¾ negligent or illegal act.”) This, however, is precisely what Mr. Miralda’s argument would require. We find his argument unpersuasive.
In sum, the record supports the trial court’s factual finding that Mr. Miralda knew or should have known of the events supporting his malpractice claims over one year before he filed suit. Accordingly, we cannot conclude that the trial court was manifestly erroneous in finding Mr. Miral-da’s claim barred by peremption under the one-year peremptive period set forth in La. R.S. 9:5605(A).

The fraud exception

The fraud exception to the statutory provision is set forth in La. R.S. 9:5605(E), which provides that the “peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.” The Louisiana Civil Code defines fraud as “a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inactions.” La. C.C. art. 1953. Fraud must be pled with particularity. La. C.C.P. art. 856.
The fraud exception under La. R.S. 9:5605(E) does not suspend the running of prescription indefinitely; rather, “it lifts the three year peremptive period, giving the claimant one year from the date of the discovery of the actions which allegedly constitute malpractice.” Granger v. Middleton, 06-1351, p. 4 (La.App. 3 Cir. 2/7/07), 948 So.2d 1272, 1275.
In his petition, Mr. Miralda asserted the following fraud claims:
DEFENDANTS intentionally defrauded Mr. Miralda regarding the status of the matter, advising him that it was moving along, when in fact no attorney work was performed related to Mr. Miralda’s case, and defendants never ad *1015 vised Mr. Miralda regarding any possible recourse related to his matter, and defendants intentionally delayed 127finalizing representation in this matter in order to aim to protect itself from a malpractice action.
Mr. Miralda contends that because he has alleged legal malpractice based on fraud, pursuant to La. R.S. 9:5605(E), the one-year peremptive period set forth in La. R.S. 9:5605(A) does not apply to bar his claim. Contrary to Mr. Miralda’s contention, “[a]llegations in a petition are presumed true for purposes of a hearing on an exception of peremption only when no evidence is presented at the hearing on the exception.” Lomont, 14351 at p. 10, — So.3d at - (citing Carriere v. Bodenheimer, Jones, Szwak, & Winchell, L.L.P., 47,186, p. 4 (La.App. 2 Cir. 8/22/12), 120 So.3d 281, 284). In this case, a two-day evidentiary hearing was held on the exception.
Mr. Gonzalez contends that the facts underlying Mr. Miralda’s fraud claims are essentially the same as the facts underlying the roughly six malpractice claims, which the trial court found that Mr. Miral-da knew or should have known about more than one year before he filed suit.[21] It follows, Mr. Gonzalez contends, that the trial court’s finding that Mr. Miralda knew of those facts for more than a year before filing suit precludes the application of the fraud exception. Mr. Gonzalez also emphasizes that the existence of fraud is a question of fact and that the trial court’s findings with respect to fraud are subject to the manifest error standard of [¡^review on appeal. Smith v. Roussel, 00-1028, p. 4 (La.App. 1 Cir.6/22/01), 809 So.2d 159, 164. Finally, Mr. Gonzalez points out that this court has rejected the idea that the concealment of legal malpractice constitutes fraud under La. R.S. 9:5605(E).
As Mr. Gonzalez correctly points out, this court has held that post-malpractice, fraudulent concealment does not constitute fraud as contemplated by the fraud exception codified in La. R.S. 9:5605(E). In Vazquez, we noted that “Louisiana courts of appeal have consistently rejected the idea that the concealment of legal malpractice constitutes fraud under Louisiana Revised Statute 9:5605(E).” 12-1694 at p. 15, 119 So.3d at 909 (collecting cases).[22] The plaintiff in Vazquez expressly urged this *1016 court to reconsider this “jurisprudentially created” interpretation of the statute. Declining to do so, we noted that the facts of the Vazquez case did not warrant it.[23] As in Vazquez, we find the facts of this case do not warrant reconsidering the jurispru-dentially created interpretation of this statute. Instead, agreeing with Mr. Gonzalez, we find the evidence supports the trial court’s finding that Mr. Miralda knew or should have known of the alleged acts of fraud over one year before filing suit and that the fraud exception thus is inapplicable.
|gaAs Mr. Gonzalez points out, the trial court in its reasons for judgment addressed several of Mr. Miralda’s fraud allegations and found that Mr. Miralda was either aware or should have been aware of the alleged acts of fraud over one year before filing suit. Addressing Mr. Miral-da’s allegations that he was invoiced for services never provided and that he was unaware of Mr. Gonzalez’s efforts to assist him in saving the Property, the trial court stated:
• Through their efforts, Mr. Gonzalez and Mr. Chacon were able to postpone the foreclosure sale five times, allowing Mr. Miralda to stay in his house for two more years. In the Court’s opinion, these postponements alone justify the legal fees charged.
• After that [the eviction in October 2010], Defendant concentrated efforts on obtaining a loan from another lender in order to buy back the house from Wells Fargo. This effort, too, failed, since Mr. Miralda was not working and could not show he had the financial means to repay the loan. His sister Rosa Velasquez, who was steadily employed and had savings, refused to co-sign a loan with him, ending his chances of keeping his house. All this was well-known to plaintiff well over a year before he filed this suit.
Addressing Mr. Miralda’s allegation that Mr. Gonzalez failed to meet with him or to advise him regarding his case, the trial court stated:
• Mr. Miralda also complained that he never met with Mr. Gonzalez even once. “I never had an appointment with him.” He maintained all the work was done by Mr. Chacon, whom he thought was a lawyer, but was not a lawyer. Putting aside whether [Mr.] Miralda’s account is true (Defendant testified it was not), clearly [Mr.] Mir-alda knew of his alleged non-meeting with Mr. Gonzalez more than a year before he filed this suit.
• Nevertheless, even accepting Mr. Mir-alda’s account for peremption purposes, he plainly had to be aware each time he met with Mr. Chacon instead of his attorney, Mr. Gonzalez.
Addressing Mr. Miralda’s allegation that Mr. Chacon failed to give to him the money from a check that Wells Fargo returned, the trial court stated:
• Mr. Miralda also alleges Mr. Chacon accompanied him to the bank to help him cash two checks returned by Wells Fargo, but then did not give him the money from the larger check. This also was contradicted Roby the evidence at trial. [The ledger Ms. Le- *1017 tona prepared shows that on June 18, 2009, Mr. Miralda was issued- two checks for the amounts at issue.]
• [0]bviously, if Mr. Chacon had kept his money, it should have prompted Mr. Miralda to take action.
At the hearing, Mr. Gonzalez was questioned regarding the fraud' claim and expressly denied it. We find it unnecessary to reach the issue of whether fraud was established in this case. Regardless of whether fraud was established, Mr. Miral-da “failed to bring the malpractice action within one year of the alleged act or within the always-applicable one-year period, beginning from the date that the alleged act was discovered or should have been discovered.” Dauterive Contractors, 01-1112 at p. 29, 811 So.2d at 1261. “Subsection E of La. R.S. 9:5605 carves out an exception for the three-year peremptive period only.” Id. (citing Broussard v. F.A. Richard & Assoc. Inc., 98-1167 (La.App. 3 Cir. 3/17/99), 732 So.2d 578 (holding that a fraud claim, while not subject to the three-year peremptive period, remains subject to the one-year period.)). In this case, we find, as in Dauterive Contractors, that “[t]he three-year peremptive period is therefore inapplicable, as is the fraud exception thereto.” Id. We thus find Mr. Miralda’s reliance on the fraud exception is misplaced.
ANSWER TO APPEAL
Mr. Gonzalez answered the appeal to raise the following two issues: (i) whether the trial court erred in failing to award his costs as prayed for in his exception; and (ii) whether he is entitled to frivolous appeal damages. We separately address each issue.

Costs

| si The first issue is whether the trial court erred in failing to award Mr. Gonzalez his costs as prayed for in his peremptory exception of peremption. The trial court, in its judgment, granted the exception of peremption dismissing Mr. Miralda’s claims with prejudice. The trial court, however, provided in its judgment that “each party [was] to bear their own costs.” Mr. Gonzalez contends that pursuant to La. C.C.P. art. 1920, as the prevailing party, he should not have been cast with his own costs. Article 1920 provides that “[u]nless the judgment provides otherwise, costs shall be paid by the party east, and may be taxed by a rule to show cause.” La. C.C.P. art. 1920.
Although a trial court has discretion in assessing court costs, Mr. Gonzalez points out that the trial court’s discretion is not unlimited. He further points out that the jurisprudence has held it is an abuse of discretion to tax the prevailing party with costs unless that party in some way incurred additional costs pointlessly or engaged in other conduct that justified the assessment of costs against that litigant. In support, he cites the following two cases from other circuits: Treen Const. Co. v. Schott, 03-1232 (La.App. 5 Cir. 1/27/04), 866 So.2d 950, 957; and Penton v. Schuster, 98-1068 (La.App. 5 Cir. 3/30/99), 732 So.2d 597, 599, 602. Mr. Gonzalez contends that he prevailed in all respects, that he “did nothing to justify the assessment of costs,” and that Mr. Miralda “engaged in delaying tactics to avoid resolution of the claims.” Mr. Gonzalez thus contends that the trial court abused its discretion by assessing him with costs.
Although the general rule is that the party cast in judgment should be taxed with costs, a trial court is granted the discretion to assess costs in any equitable manner. Spillers v. ABH Trucking Co., 30,332, pp. 9-10 (La.App. 2 Cir. 4/13/98), 713 So.2d 505, 511. This court has held that “[t]he language of Article 1920 *1018 |32expressly grants discretion to the trial court to deny the prevailing party an award for its court costs.” Lafayette Ins. Co. v. C.E. Albert Const. Co., Inc., 98-1831, pp. 7-8 (La.App. 4 Cir. 8/31/99), 731 So.2d 968, 972 (citing Schlesinger v. Herzog, 95-1127, p. 25 (La.App. 4th Cir.4/3/96), 672 So.2d 701, 716); see also Rubenstein v. City of New Orleans, 07-1211, p. 6 (La.App. 4 Cir. 4/30/08), 982 So.2d 964, 968.
As noted above, Mr. Gonzalez contends that Mr. Miralda should pay all the costs because he lost after an evidentiary hearing on the peremption exception. The record is devoid of any indication as to why the trial court declined to tax Mr. Miralda with all the costs. Based on the record before this court, we are unable to conclude that the trial court abused its discretion in condemning each party to bear his own costs.

Frivolous appeal damages

The second issue Mr. Gonzalez raises in his answer is whether he is entitled to damages, including attorney’s fees and costs, for friyolous appeal under La. C.C.P. art. 2164.[24] Mr. Gonzalez contends that frivolous appeal damages should be awarded because this appeal does not present a substantial legal question and presents no basis for opposing counsel to believe the law he advocates. In support, he cites Vincent v. Vincent, 11-1822, pp. 11-12 (La.App. 4 Cir. 5/30/12), 95 So.3d 1152, 1160. Mr. Gonzalez posits that he provided opposing counsel with a full explanation and afforded opposing counsel an opportunity to desist from pursuing this frivolous malpractice action at the outset. In support, he cites his [ ^correspondence to opposing counsel, Mr. Burgos, dated July 8 and July 24, 2012. He also emphasizes the trial court’s finding that Mr. Mir-alda had failed to pay his mortgage payments and was simply not creditworthy.
In the Vincent case, cited by Mr. Gonzalez, this court denied the appel-lee’s request for frivolous appeal damages. In so doing, we quoted the governing principles for frivolous appeal damages set forth in Johnson v. Johnson, 08-0060, pp. 5-6 (La.App. 4 Cir. 5/28/08), 986 So.2d 797, 801, which are as follows:
Appellate courts “shall render any judgment which is just, legal, and proper upon the record on appeal” and “may award damages for frivolous appeal....” La. C.C.P. art. 2164. The statute permitting frivolous appeal damages must be strictly construed in favor of the appellant, as it is penal in nature. Levy v. Levy, 02-0279, pp. 17-18 (La.App. 4 Cir. 10/2/02), 829 So.2d 640, 650. Frivolous appeal damages will be awarded if the appellant is trying to “delay the action” or “if the appealing counsel does not seriously believe the law he or she advocates.” Hester v. Hester, 97-2009, p. 5 (La.App. 4 Cir. 6/3/98), 715 So.2d 43, 46. An appeal may also be deemed frivolous if it does not present a “substantial legal question.” Tillmon v. Thrasher Waterproofing, 00-0395, p. 8 (La.App. 4 Cir. 3/28/01), 786 So.2d 131, 137. “Appeals are always favored and, unless the appeal is unquestionably frivolous, damages -will not be granted” due in part to the possible chilling effect on the appellate process. Tillmon, 000395, p. 8, 786 So.2d at 137.
*1019 Although a successful appeal is by definition non-frivolous, the converse is not true. Haney v. Davis, 04-1716, p. 11 (La.App. 4 Cir. 1/19/06), 925 So.2d 591, 598. Even when an appeal lacks serious legal merit, frivolous appeal damages will not be awarded unless the appeal was taken solely for the purpose of delay or the appellant’s counsel is not serious in the position he advances. Dugas v. Thompson, 11-0178, p. 15 (La.App. 4 Cir. 6/29/11), 71 So.3d 1059, 1068 (citing Elloie v. Anthony, 95-0238, p. 3 (La.App. 4 Cir. 8/23/95), 660 So.2d 897, 899); see also Hardy v. Easy T.V. and Appliances of Louisiana, Inc., 01-0025, p. 9 (La.App. Cir. 12/12/01), 804 So.2d 777, 782; Sherman for and on Behalf of Magee v. B & G Crane Service, 455 So.2d 1275, 1278 (La.App. 4th Cir.1984).
Any doubt regarding whether an appeal is frivolous must be resolved in the appellant’s favor. City of Ruston v. Perritt, 30,896, p. 13 (La.App. 2 Cir. 9/23/98), 718 So.2d 1044, 1052; see also Troth Corp. v. Deutsch, Kerrigan & Stiles, L.L.P., 06-0457, p. 5 (La.App. 4 Cir. 1/24/07), 951 So.2d 1162, 1166. Applying the rule of strict construction against the appellee (Mr. Gonzalez) and considering the record in this case, we cannot conclude that the appellant’s (Mr. Miralda’s) appeal is frivolous. Therefore, we deny Mr. Gonzalez’s request for frivolous appeal damages.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. The request for frivolous appeal damages is denied.
AFFIRMED; REQUEST FOR FRIVOLOUS APPEAL DAMAGES DENIED

. Although the petition alleges that the seizure had not yet been effected, the record reflects that before the petition was filed, the seizure had been effected. The pleadings in the executory process action establish that the Property had been seized and that a sheriff’s sale had been set for August 2007.

. These malpractice claims were as follows: (i) failing to meet with Mr. Miralda or to advise him regarding his case, (ii) failing to enroll in the pending foreclosure action, (iii) failing to provide him with an accounting of his funds in the trust account (the Deposit) and invoicing him for over $6,800 for attorney services without evidence that such services were performed, (iv) failing to stop the Property from being seized and failing to advise him that there was no further recourse yet keeping this matter open well beyond the date of the seizure, (v) refusing to do anything to prevent him from hurting his legal interest (by allowing him to withdraw funds from the Deposit) and failing to advise him that doing so might hurt his case, and (vi) delaying final resolution of the matter willfully in order to protect Mr. Gonzalez’s own interest.

. According to Mr. Miralda, he continued to live on the Property in a FEMA trailer during the time the repairs were made to the house.

. According to Mr. Gonzalez, he was engaged by Mr. Miralda pursuant to an oral agreement. Under the agreement, Mr. Gonzalez was to be paid a fixed fee; an additional fixed fee could be charged depending on how complex and lengthy the matter might become.

. According to Mr. Gonzalez, Mr. Miralda failed to inform him at the initial visit of the following four significant facts: (1) that, in March 2007, an executory proceeding to foreclose on the Property was commenced; (2) that he had been delinquent since March 2005 on the Mortgage Note; (3) that Maria Miralda’s succession was opened in 2004 and a judgment of possession rendered; and (4) that he had four, not two, surviving sisters.

. Mr. Miralda signed the Sworn Detailed Descriptive List for the succession; thus, he apparently was responsible for, or participated in, the opening of the succession in 2004.

. Mr. Gonzalez's and Mr. Chacon’s affidavits state that the initial meeting was on January 16 or January 17, 2008. However, Mr. Gonzalez’s testimony at the hearing and the entry on his calendar, which was introduced into evidence, reflect that the initial meeting occurred on January 9, 2008.

. Mr. Gonzalez also learned that a judicial sale had earlier been scheduled for August 2007. Wells Fargo's attorney that was han *1004 dling the foreclosure, Dean Morris, had postponed the August 2007 judicial sale and had reset it for a new date.

. The $30,000 figure corresponded approximately with the amount that Mr. Miralda was in arrears on the Mortgage Note when he first consulted the firm regarding the foreclosure. At that time, he was thirty-three months in arrears.

. Although this offer was made before Mr. Miralda made the Deposit, the firm's file contained a letter dated February 6, 2008 from a banking officer at Whitney Bank stating that Mr. Miralda had a checking account with the bank and that, as of February 5, 2008, the balance in that account was $67,884.56.

. On May 27, 2009, Mr. Miralda sent Wells Fargo two cashier checks, which were to cover the June 1, 2009 payment ($1,114.82) and the escrow shortage ($2,640.07). These payments were sent in response to a new payment coupon that Wells Fargo sent to Mr. Miralda. Thereafter, Wells Fargo returned the two cashier checks to Mr. Miralda. On June 18, 2009, Mr. Chacon accompanied Mr. Miralda to Capital One, Mr. Gonzalez’s bank, to cash these cashier checks. According to Mr. Miralda, Mr. Chacon had him endorse the two checks. Mr. Miralda claims that he was allowed to retain the cash from the smaller check ($1,114.82), but Mr. Chacon retained the cash for the larger check ($2,640.07). Mr. Miralda further claims that two days later he called the firm and was told that Mr. Chacon was vacationing in Honduras. However, the ledger, which Ms. Letona prepared, reflects that on June 18, 2009, Mr. Miralda was issued two checks in the amounts of $1,114.82 and $2,640.07- — the amounts of the two cashier checks.

. As discussed elsewhere in this opinion, between March 2009 and June 2011 Mr. Mir-alda made eighteen withdrawals from the Deposit, reducing the amount available to negotiate with Wells Fargo.

. In her deposition, Ms. Velasquez testified that she never met Mr. Gonzalez.

. Copies of the cancelled checks were also provided to Mr. Miralda.

. The trial court, in its written reasons for judgment, noted that it was significant that "Mr..Chacon and Mr. Gonzalez both are na-rive Spanish speakers. Mr. Chacon is from the same country as Mr. Miralda, so there was no language barrier to impede Mr. Miral-da’s understanding of his case.”

. Louisiana law defines peremption as "a period of time fixed by law for the existence of a right. Unless timely exercised, the right is extinguished upon the expiration of the peremptive period.” La C.C. art. 3458. “The provisions on prescription governing computation of time apply to peremption.” La. C.C. art. 3459.

. The only other statutory exception to La. R.S. 9:5605 is codified in La. R.S. 9:5605.1, which provides:
A. Notwithstanding the provisions of R.S. 9:5605, prescription of a claim of theft or misappropriation of funds of a client by the client’s attorney shall be interrupted by the filing of a complaint with the Office of Disciplinary Counsel, Louisiana Attorney Disciplinary Board, by the client alleging the theft or misappropriation of the funds of the client.
B. The record of the hearing of the Office of Disciplinary Counsel, Louisiana Attorney Disciplinary Board, held to review the claim of theft or misappropriation of the funds of the client may be admissible as evidence in the civil action brought to recover the stolen or misappropriated funds, and in such action, the court may award reasonable attorney fees to the client.
This exception is not cited by Mr. Miralda. Nor do we find any support in the record for applying this exception.

. In 2008, the Louisiana Legislature amended La. C.C.P. art. 927 to add peremption to the list of enumerated objections that may be raised by peremptory exception. Naghi v. Brener, 08-2527, p. 2, n. 2 (La.6/26/09), 17 So.3d 919, 920 (citing La. C.C.P. art. 927(A)(2), added by Acts 2008, No. 824, § 1, eff. Jan. 1, 2009).

. This was the date on which Mr. Gonzalez provided his second written response to opposing counsel’s requests for information.

. In Wong, the defendants were two attorneys who represented the plaintiff, Ms. Wong, in her divorce and child custody support proceeding. The plaintiff identified four separate instances of malpractice. The trial court found that the plaintiff's action was barred by peremption. Reversing, this court found that each of the separate acts of malpractice had to be considered a separate cause of action with its own one and three year peremptive periods. Two of the claims (the third and fourth), we found, were not prescribed on the face of the petition. As to the other two claims (the first and second), which occurred more than one but less than three years before the date the plaintiff filed suit, we noted that the issue was whether the plaintiff's "knowledge comported with that of a reasonable lay person faced with the same circumstances." Wong, 05-1483 at p. 10, 973 So.2d at 10. As to the first claim, we found that it was not barred by peremption, reasoning:
Ms. Wong’s first allegation is that Mr. Hoffman advised her to agree to joint custody of her children (which was provided for in the consent judgment between Ms. Wong and her spouse dated October 6, 2000), despite his knowing that Ms. Wong’s spouse had physically abused her and that Ms. Wong wanted to relocate to another state with her children. The defendants argue that Ms. Wong should have known at the time she entered into the joint custody agreement that her attorney's advice to do so fell below the standard of care. We disagree. While Ms. Wong may have been uncomfortable or uneasy about consenting to joint custody, we cannot conclude that a reasonable lay person would have realized at that time that her attorney’s advice to do so might be considered malpractice. As joint custody is clearly preferred in the law, it is not reasonable to expect a non-lawyer to recognize what circumstances would likely merit an exception to the general rule. We therefore find that Ms. Wong’s suit, which was filed within a year of her consultation with the new attorney and within three years of the entering of the consent judgment, was timely with respect to this alleged act of malpractice.
Wong, 05-1483 at p. 11, 973 So.2d at 11.
As to Ms. Wong’s second claim, we noted that this claim was that during the summer 2001 hearing on the plaintiff’s request to relocate, her attorney failed to object to the expert’s testimony on the basis that the expert had previously served as a court-appointed mediator in the case. The plaintiff’s argument was that "she was not aware that Mr. Hoffman’s failure to raise this particular objection could potentially constitute malpractice until she was so informed by her new attorney in April, 2002.” The defendants countered that the plaintiff possessed sufficient knowledge to put her on notice that defendant's conduct could be considered malpractice on August 25, 2001, when the district court rendered judgment denying Ms. Wong’s request to relocate. Rejecting that argument, we reasoned that ”[i]t is ludicrous to suggest that a reasonable lay person would know the import of an attorney’s failure to raise a particular legal objection. We also reject defendants’ suggestion that the mere fact that the trial court ruled against Ms. Wong on her motion to relocate should have raised an inference in her mind that her attorney was negligent." Wong, 05-1483 at pp. 11-12, 973 So.2d at 11.

. As Mr. Gonzalez notes, Mr. Miralda contends that the following ten pertinent facts support the fraud allegations set forth in his verified petition: (i) failing to explain the fees charged; (ii) misleading Mr. Miralda to believe Mr. Chacon was an attorney when he was not; (iii) refusing to meet with Mr. Miral-da; (iv) failing to deposit Mr. Miralda’s funds into his trust account; (v) the alleged misappropriation of Mr. Miralda's check by Mr. Chacon; (vi) failing to forward the $20,000 offer to Wells Fargo as directed by Dean Morris; (vii) failing to return Mr. Miralda’s money held to negotiate with Wells Fargo and lenders before June of 2011 when Mr. Gonzalez was no longer working on the case; (viii) keeping Mr. Miralda’s funds after June of 2011 to justify a fee based on the amount of time the file was open; (ix) withholding Mr. Miralda’s file documents from new counsel and manipulating the peremption timeliness to support peremption; and (x) failing to explain his representation to Mr. Miralda as events were occurring and when the representation was concluded in June 2011.

. However, in a footnote we mentioned a contrary position, citing “Jenkins v. Starns, and the majority’s treatment of the dissent by Judge McClendon in the opinion of the First Circuit.” Vazquez, 12-1694 atp. 16, n. 7, 119 So.3d at 909. After our opinion in Vazquez was decided, the Fifth Circuit held that post-malpractice fraudulent acts can bar the application of the three-year peremptive period under the fraud exception of La. R.S. 9:5606(E). Garner v. Lizana, 13-427 (La.App. 5 Cir. 12/30/13); 131 So.3d 1105, writ denied, 14-208 (La.4/4/14); 135 So.3d 1183; Lomont v. Myer-Bennett, 14-351 (La.App. 5 Cir. 10/29/14), - So.3d -, 2014 WL 5463316.

. In Vazquez, we reasoned that "[t]here is no evidence in the record to support Rev. Smart’s claim that the defendant attorneys fraudulently concealed their alleged malpractice from him. The evidence actually supports a finding Rev. Smart was present when his underlying malpractice case was argued before the Fifth Circuit and was well aware (perhaps even before then) that his underlying medical malpractice claim was in jeopardy. Therefore, we reject Rev. Smart's argument that his attorneys fraudulently concealed malpractice from him.” 12-1694 at p. 16, 119 So.3d at 910.

. La. C.C.P. art. 2164 provides that an appellate court may “award damages, including attorney fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered, equitable.” See also Rule 2-19 of the Uniform Rules, Courts of Appeal provide that a "court may award damages for frivolous appeal in civil cases as provided by law.”